**Richard PICCICUTO d/b/a Sheehan's Cafe, Plaintiff–Appellant,**

**v.**

**Ralph E. DWYER, Defendant–Appellee.**

**Richard PICCICUTO, Plaintiff–Appellant,**

**v.**

**Linda L. REX, Defendant–Appellee.**

**Nos. 94–1726, 94–1735.**

United States Court of Appeals, First Circuit.

Heard Oct. 4, 1994.

Decided Nov. 9, 1994.

---

Steven Weiss, with whom Shatz, Schwartz and Fentin, P.C., Springfield, MA, Richard M. Howland, and Law Offices of Richard M. Howland, Amherst, MA, were on brief for appellant, David J. Noonan, with whom Cohen, Rosenthal, Price, Mirkin & Wernick, Springfield, MA, for trustee in bankruptcy.

John A. Burdick, Jr., with whom Burdick & DiLeo, P.C., Worcester, MA, was on brief for appellees.

Before CYR, Circuit Judge, BOWNES, Senior Circuit Judge, and McAULIFFE *, District Judge.

BOWNES, Senior Circuit Judge.

Creditor-appellant Richard M. Piccicuto commenced this adversary proceeding in the bankruptcy court which sought to have a judgment debt owed him by debtors-appellees Ralph E. Dwyer and Linda Rex ("the landlords") declared nondischargeable under 11 U.S.C. § 523(a)(6) (1989).[1] Subsequently, he filed a motion for summary judgment on his claim. The bankruptcy court not only denied his motion, it *sua sponte* granted summary judgment to the landlords. The district court affirmed. Because we find that summary judgment should have been entered *for* Piccicuto, and not against him, we reverse.

## I.

Throughout 1984 and 1985, the landlords owned commercial rental property ("the property") in Northampton, Massachusetts. Ralph Dwyer's son, Jeffrey Dwyer, managed the property. During that same time period, Richard Piccicuto owned and operated Sheehan's Cafe, Inc., which was a tenant of several units (including two basement units) of the property. Until July 13, 1984, when the parties executed leases for these basement units, Sheehan's had been a tenant-at-will therein.

On July 20, 1984, Jeffrey Dwyer met with Timothy and Paul Driscoll, who had been negotiating with Piccicuto for the purchase of Sheehan's. At that meeting, the Driscolls requested that the leases of the basement units be assigned to them. Jeffrey Dwyer not only declined this request, he denied the existence of the leases. When the Driscolls reported this to Piccicuto, he telephoned Jeffrey Dwyer, who informed him that the con-

---

\* Of the District of New Hampshire sitting by designation.

1. Section 523(a)(6) precludes the discharge of debts incurred "for willful and malicious injury by the debtor to another entity or to the property of another entity."

templated deal with the Driscolls was too good, and that there would be no assignment unless he and the landlords were paid $50,000 up front. Piccicuto did not accede to Dwyer's demand.

For the ensuing ten months, Piccicuto attempted to rectify the situation with the Driscolls, and otherwise tried to sell the business by placing listings with brokers. Jeffrey Dwyer interfered with these efforts by telephoning the brokers and informing them that the leases were invalid, void, or in litigation. As a result, the brokers withdrew from listing and showing the property. During this same time period, whenever Piccicuto's rent payments were a day or so late, Jeffrey Dwyer deluged him with notices of breach, notices of termination, and notices to quit. He also commenced a barrage of noise complaints to the police, none of which was substantiated to the point of police or court action. In addition, in January 1985, the landlords initiated what became series of eviction proceedings against Piccicuto. All of these proceedings eventually concluded with judgments in Piccicuto's favor.

Piccicuto was not able to sell the property and, on July 8, 1985, filed for protection under Chapter 11 of the Bankruptcy Code. Subsequently, in September 1985, he filed an action in Massachusetts Superior Court against Jeffrey Dwyer and the landlords which sought damages for, *inter alia*, intentional interference with an advantageous business relationship and unfair trade practices in a commercial context. *See* Mass. Gen.L. ch. 93A, § 2 (1993). The case went to trial in June 1989. Although all defendants were represented at trial, only defendant Jeffrey Dwyer chose to appear and testify. At the conclusion of the trial, the court submitted the common law intentional interference claims to the jury on special questions, reserving to itself Piccicuto's claims under ch. 93A. The jury returned a verdict in favor of Piccicuto for $371,000. The court accepted this verdict and doubled it to $742,000 under Mass.Gen.L. ch. 93A, § 11 (1993), which directs courts to award no less than double and no more than triple the actual damages resulting from a "willful or knowing" violation of ch. 93A, § 2. In conjunction

with its decision, the superior court issued a comprehensive memorandum detailing its findings and rulings. The memorandum clearly states that "the defendants' acts [were] willful, malicious and unjustified." Appendix at 151–52 (emphasis supplied). The Massachusetts Appeals Court affirmed in all respects. *Piccicuto v. Dwyer*, 32 Mass. App.Ct. 137, 586 N.E.2d 38 (1992).

Meanwhile, in September 1989, the landlords filed Chapter 11 petitions with the United States Bankruptcy Court for the District of Massachusetts. Subsequently, Piccicuto brought this adversary proceeding, and in due time moved for summary judgment. As we have noted, Piccicuto argued that 11 U.S.C. § 523(a)(6) precludes discharge of the $742,000 judgment debt. He based his argument on two theories. First, Piccicuto contended that the doctrine of collateral estoppel precluded the landlords from attacking in the bankruptcy court the superior court's ch. 93A findings that they had acted willfully, maliciously, and unjustifiably, and that these findings were, by virtue of collateral estoppel, binding on the bankruptcy judge. *See Grogan v. Garner*, 498 U.S. 279, 285 n. 11, 111 S.Ct. 654, 658 n. 11, 112 L.Ed.2d 755 (1991) (principles of collateral estoppel, as set forth in the Restatement (Second) of Judgments § 27, apply in dischargeability proceedings brought under § 523(a)). In the alternative, Piccicuto asserted that even if Jeffrey Dwyer was the only defendant who willfully and maliciously caused him injury, Jeffrey's actions should be imputed to the landlords under a theory of vicarious liability.

The bankruptcy court rejected these arguments. For reasons that are not entirely clear, it misapprehended the thrust of Piccicuto's first argument and looked only to the special verdict questions submitted to the jury on Piccicuto's common law claims. Relying on these questions, which referred only to actions taken by Jeffrey Dwyer, the bankruptcy court held that "[i]t is undisputed that the verdict and subsequent judgment was rendered against the [landlords] based solely upon their vicarious liability flowing from the actions of Jeffrey Dwyer." *In re Rex*, 150 B.R. 505, 506 (Bankr.D.Mass.1993). The bankruptcy court then ruled that vicarious

liability cannot support a finding that a debtor acted willfully and maliciously for purposes of 11 U.S.C. § 523(a)(6). *Id.* at 506–07. Finding no genuine issue of material fact remaining for trial, the bankruptcy court, acting *sua sponte,* entered judgment for the landlords. *Id.* at 507.

The district court to which Piccicuto appealed these rulings agreed with the bankruptcy court's legal conclusion regarding vicarious liability under § 523(a)(6). It also upheld as "not clearly erroneous" the bankruptcy court's "finding" that the landlords' liability was based solely on the actions of their agent, Jeffrey Dwyer. Accordingly, it affirmed the bankruptcy court's judgment.

## II.

On appeal to this court, Piccicuto makes three arguments. First, he renews his argument that the findings of the superior court in connection with his ch. 93A claim conclusively establish that the landlords themselves caused him willful and malicious injury, as those terms are understood under 11 U.S.C. § 523(a)(6). Next, he reiterates his alternative argument that vicarious liability can support a finding of willfulness and maliciousness under § 523(a)(6). Finally, he contends that the district court abused its discretion in declining his request for oral argument in this matter. We need not reach the merits of Piccicuto's second and third appellate arguments because we agree with his first one.

### A. *Summary Judgment in Bankruptcy Proceedings*

We very recently elaborated upon the operation of summary judgment in bankruptcy proceedings. *See In re Varrasso,* 37 F.3d 760, 762–63 (1st Cir.1994). We need not, therefore, rehearse the relevant legal principles at great length. Suffice it to say that our review of an order initially made under Bankruptcy Rule 7056 (governing summary judgment in bankruptcy proceedings) does not differ in any material respect from our review of an order under Fed. R.Civ.P. 56. We review such an order *de novo,* determining whether the lower courts have correctly assessed the record in deciding that genuine issues of material fact do, or do not, remain for trial. *See In re Varrasso,* 37 F.3d at 763. As always, in making this determination, we will read the record and draw all reasonable inferences in the manner most favorable to the party opposing summary judgment. *Id.*

### B. *Applying the Principles*

As an initial matter, we note that the district court applied the wrong standard of review in ruling upon Piccicuto's first argument. The bankruptcy court did not make any findings of fact entitled to deference; instead, it merely stated its reading of the superior court's opinion in the course of making a summary judgment ruling. *See id.* at 763 and n. 2. The district court therefore should have reviewed *de novo* the bankruptcy court's legal determination regarding the effect of the superior court's findings.

Although we could remand to the district court for reconsideration under the appropriate standard of review, doing so would serve no useful purpose. As we explained in *Varrasso:* "The validity *vel non* of a summary judgment entails a pure question of law and, therefore, we are fully equipped to resolve the question as a matter of first-instance appellate review." *Id.* at 763. Accordingly, we address on the merits Piccicuto's first appellate issue.

The easiest way to frame this issue is to note at the outset that which is not disputed. First, there is no dispute that those issues necessarily determined by the superior court in finding that the landlords and Jeffrey Dwyer had violated ch. 93A, §§ 2 and 11, are to be given effect in this proceeding. "When an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim." Restatement (Second) of Judgments § 27 (1982).

Nor is there any dispute that the findings the superior court necessarily made under

ch. 93A, §§ 2 and 11,[2] are tantamount to findings of "willful and malicious" behavior under § 523(a)(6). The landlords agree with Piccicuto that, for an act to be willful and malicious under § 523(a)(6), it must be "deliberate," "wrongful," and "done without regard to its consequences," *see* Brief of Appellees at 9–10, and that the superior court's findings conclusively establish that Piccicuto was the victim of willful and malicious behavior under this definition, *see* Brief of Appellees at 4 (conceding that Jeffrey Dwyer's conduct was willful and malicious).[3]

Finally, there is no real dispute that, in its findings of fact on Piccicuto's ch. 93A claim, the superior court used language indicating that it was going beyond theories of vicarious liability and holding the landlords liable for their *own* acts and conduct towards Piccicuto. *See* Appendix at 151–52 ("[T]he damages awarded must be multiplied under [ch. 93A, § 11] particularly where, as here, the defendants' acts are willful, malicious and unjustified."); Appendix at 152 n. 17 (describing the aforementioned "acts" as "[o]f active and relentless campaign against [Piccicuto], and of reckless disregard of the conduct of the business of this property *by the owners,* who took no role in supervising, even though they were the parties in at least five separate state court proceedings and one bankruptcy court proceeding in which they, in the final analysis were not successful"); Appendix at 153 ("[T]he *conduct* of *all* defendants violated the generally accepted standards, falling outside

the penumbra of established concepts of fairness. It may be fairly characterized as unethical, unscrupulous, [and] causing substantial injury to [Piccicuto and his business].") (emphases supplied).

There is, however, vehement disagreement about the real meaning of the superior court's findings on Piccicuto's ch. 93A claim. Piccicuto contends that the superior court meant exactly what it said: that the landlords *themselves* acted willfully and maliciously towards Piccicuto and his business. The landlords, for their part, assert that the court could not have meant what it said—or more precisely, that the court used regrettably loose language in describing their "acts" and "conduct"—because there was no evidence that *they* acted against Piccicuto in any way. In so doing, the landlords paint themselves as absentee owners who recklessly failed to supervise their out-of-control, onsite agent.

Leaving aside the question of whether the principles underlying the issue preclusion doctrine allow us to go beyond the unambiguous findings of a state court judge and assess whether there was a factual foundation for the findings, we find the landlords' reading of the state court record to be myopic. While the landlords may not have personally led the charge against Piccicuto, they *themselves* brought at least two eviction proceedings against him when he was trying to save his deal with the Driscolls and/or otherwise sell

---

**2.** Under ch. 93A, § 2, the superior court necessarily found that the landlords' and Jeffrey Dwyer's actions (1) were outside the penumbra of established concepts of fairness; (2) were unethical or unscrupulous; and (3) caused Piccicuto and his business substantial injury. *See Wasserman v. Agnastopoulos,* 22 Mass.App.Ct. 672, 497 N.E.2d 19, 23, *rev. denied,* 398 Mass. 1105, 499 N.E.2d 298 (1986). Under ch. 93A, § 11, the superior court necessarily found that the landlords' and Jeffrey Dwyer's violation of ch. 93A, § 2 was willful. *Wasserman,* 497 N.E.2d at 24.

**3.** We are aware that some federal courts seem to have construed 11 U.S.C. § 523(a)(6)'s "willful and malicious" provision more strictly than the Massachusetts courts have interpreted ch. 93A, § 11's "willful or knowing" provision. While we have been unable to locate any authority which reads ch. 93A, § 11, as requiring an actual intent to injure, a few federal courts have interpreted § 523(a)(6) as imposing such a requirement. *See*

*In re Conte,* 33 F.3d 303, 306–07 (3rd Cir.1994) (noting that the circuits have variously defined a willful and malicious act under § 523(a)(6) as a wrongful act done with intent to injure, a wrongful act that will almost certainly produce harm, and a wrongful act that has a high probability of causing harm) (collecting cases); *see also In re Scarlata,* 979 F.2d 521, 536–39 (7th Cir.1992) (Coffey, J., dissenting) (noting the same split in the circuits but arguing that most courts have adopted a definition which, in essence, looks to whether the debtor has acted in knowing disregard of the rights of another and whether the debtor should have foreseen that injury could occur) (collecting cases).

At any rate, because this circuit has not yet passed on this difficult and controversial issue, and because the landlords have expressly adopted Piccicuto's favorable construction of the statute, we decline to delve into it at this time.

his business. The superior court made it clear that these eviction proceedings, which ended in judgments for Piccicuto, were an integral part of the campaign of harassment and intimidation underlying its finding that "all defendants," by their "conduct," violated ch. 93A, §§ 2 and 11. *See* Appendix at 151.[4] In our view, this ends the matter; the superior court's unambiguous and factually supported findings must be given effect in this action. Piccicuto therefore should have been awarded summary judgment on his claim that the $742,000 judgment debt is not dischargeable in bankruptcy.

### III.

For the reasons stated above, the bankruptcy court erred in awarding summary judgment to the landlords and in not awarding summary judgment to Piccicuto. It follows that the district court erred in affirming the bankruptcy court's mistaken order. We therefore reverse the judgment below and enter summary judgment for Piccicuto.

*So ordered.*

---

4. We note that the superior court's reference to the eviction proceedings is preceded by a statement that the proceedings were brought by Jeffrey as agent for debtors. Piccicuto has documented, however, that *this statement* (and not the court's ultimate finding) was a slip of the pen. Debtors themselves, as owners of the property, initiated the eviction proceedings. *See* Appendix at 96–97.