United States Court of Appeals
For the First Circuit For the First Circuit



No. 96-2195

DAVID L. PRINTY,

Appellant,

v.

DEAN WITTER REYNOLDS, INC.,

Appellee.


APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nancy Gertner, U.S. District Judge] 



Before

Boudin, Circuit Judge, 

Bownes, Senior Circuit Judge, 

and Lynch, Circuit Judge. 


Evan Slavitt, with whom Joseph S.U. Bodoff, and Hinckley, Allen, 
& Snyder were on brief for appellant. 
Mary DeNevi, with whom Bingham, Dana & Gould LLP were on brief 
for appellee.



April 10, 1997


BOWNES, Senior Circuit Judge. The overarching BOWNES, Senior Circuit Judge. 

issue in this bankruptcy case is whether an arbitration award

of $1,009,820.00, made by a panel of the National Association

of Securities Dealers to appellee Dean Witter Reynolds, Inc.,

against appellant David L. Printy is a non-dischargeable debt

under Chapter 11 of the Bankruptcy Code. The district court

affirmed an opinion of the bankruptcy court holding, on a

summary judgment motion, that the debt was non-dischargeable.

We affirm. There are a number of subsidiary issues which we

address in the course of our opinion.

Because the appeal is from the grant of a motion

for summary judgment, our review is de novo on all issues. 

Hope Furnace Assocs., Inc. v. FDIC, 71 F.3d 39, 42-43 (1st 

Cir. 1995); Alexis v. McDonald's Restaurants of Mass., 67 

F.3d 341, 346 (1st Cir. 1995); In re Varrasso, 37 F.3d 760, 

762-63 (1st Cir. 1994).

I. I.

THE FACTS THE FACTS 

We start with the facts, keeping in mind the

strictures of Fed. R. Civ. P. 56(c).1 Printy and his two

 

1. The rule states in pertinent part:

The judgment sought shall be rendered
forthwith if the pleadings, depositions,
answers to interrogatories, and
admissions on file, together with the
affidavits, if any, show that there is no
genuine issue as to any material fact and
that the moving party is entitled to a

-2- 2

sons were the co-trustees of The Andrea L. Printy Family

Trust, (the Trust) which had been established in 1986 after

the death of Printy's wife. Printy was an experienced

investor and knowledgeable in the finance field. At the time

of discovery in this case he was a business consultant with

eighteen years' experience in financial services. He had

been issued a broker's license and had held management

positions in several financial services companies.

On August 26, 1992, Printy transferred the Trust's

account to the office of Dean Witter in Minneapolis,

Minnesota. The record shows that Printy made all the

decisions about the Trust; the sons play no part in this

case. Dean Witter is a national broker-dealer in securities.

It is registered with the Securities and Exchange Commission

and is a member of the National Association of Securities

Dealers. The account was opened in the name of the Trust and

funded with a deposit of $50,000.00.

The account executive at Dean Witter in charge of

the Trust account was Michael Krmpotich. He and Printy were

acquainted. Printy had tried to persuade Krmpotich to join a

broker-dealer company in New Ulm, Minnesota, with which

Printy had been affiliated. It was Krmpotich who had

solicited the Trust account.

 

judgment as a matter of law.

-3- 3

Printy executed an Active Assets Account Agreement

with Dean Witter, effective September 30, 1992. Under the

terms of the agreement, any controversies relative to the

account were subject to arbitration. The Active Assets

Account permitted the holder to buy and sell securities. The

account holder could also write checks on, or receive wire

transfers from, the Account. Additionally, the securities

held in the account could be used as collateral for borrowing

funds from Dean Witter "on margin" in order to purchase

additional securities or for other reasons. The amount of

money Dean Witter would permit an account holder to borrow on

margin was calculated based on the value of the assets held

in the account. Under the agreement, if the Trust owed

money to Dean Witter for margin borrowing or other reasons,

Dean Witter was entitled to a security interest in any

securities or property held in the Trust's account.

In early September of 1992, Dean Witter received

the following assets from the Trust: a U.S. Treasury Note

and stock holdings in: Baxter International, Inc., Marion

Merrill Dow, Inc., Vital Heart Systems, Inc., Eastman Kodak

Co., Weyerhaeuser Co., Bank America Corp., and J. P. Morgan &

Co. In addition to these assets, Dean Witter received

150,000 shares of Health Concepts, Inc. and an interest in

MCI Medical Seed Limited Partnership. Printy was the

president, secretary, and a shareholder of Health Concepts.

-4- 4

He knew that the stock was not traded on any exchange or

over-the-counter market and had very little value, if any.

The bankruptcy judge points out in connection with Printy's

bankruptcy schedules that in Schedule B - Personal Property -

Printy gave a zero value to his holdings in Health Concepts

and did not discuss the stock at all in the liquidation

analysis section of his Disclosure Statement submitted with

his Plan of Reorganization. 

As part of its services, Dean Witter sent Printy

monthly statements detailing and summarizing the Trust's

assets. As of September 30, 1992, the Dean Witter statement

showed the market value of the Trust's assets to be

$191,533.33, with a borrowing limit of $141,104.50. The

statement did not reflect the receipt of the Health Concepts

stock or the interest in the MCI Medical Seed Partnership.

Next comes the event that led to this law suit.

The Dean Witter statement for the month of October 1992

showed receipt by the Trust on October 28, 1992 of 150,000

shares of Coastal HealthCare stock with a value of

$3,637,500.00. Coastal HealthCare stock is publicly traded.

In his deposition testimony Printy stated that he did not

authorize the purchase of the Coastal HealthCare stock and

never received stock-purchase confirmation slips. The reason

for this obviously mistaken increase of over three and one

half million dollars in the asset value of the Trust was a

-5- 5

computer error by Dean Witter. The Trust's virtually

worthless Health Concepts shares had been given the computer

code for Coastal HealthCare shares, thus attributing to the

Trust ownership of Coastal HealthCare stock, which it did not

own.

On November 16, 1992, Printy sent a fax to the

Trust's account broker, Krmpotich, and his assistant, Lynn

Jorgenson, asking that 15,000 shares of Coastal HealthCare be

delivered to him but left in the name of the Trust.

Jorgenson informed Printy that Dean Witter could not deliver

anything but the entire holding of 150,000 shares. Printy

authorized the delivery of the 150,000 shares. In due time,

he received a certificate for 150,000 shares of Health

Concepts, not the Coastal HealthCare shares he had requested.

The computer mix-up between Health Concepts and

Coastal HealthCare continued through November of 1992. The

November 1992 statement showed that 150,000 shares of Coastal

HealthCare valued at $3,712,500.00 had been debited from the

account. As a result, the total asset value of the Trust

shrunk to $100,475.00 from the October value of

$3,775,925.00.

Printy returned the 150,000 shares certificate of

Health Concepts to Dean Witter on December 1, 1992. The

computer continued on its merry way in the wrong direction.

The Dean Witter December 1992 statement showed the Trust's

-6- 6

receipt on December 2 of 150,000 shares of Coastal

HealthCare, with an increase in asset value from $100,475.00

to $4,984,275.00.

The December statement, however, showed more than

the return of the Coastal HealthCare stock to the Trust

account. It showed that Printy purchased a total of 22,409

shares of stock in twelve companies and withdrew through wire

transfers or checks, $262,501.11 from the account. In

January of 1993, Printy bought a total of 16,763 shares of

stock in eight companies and withdrew $373,670.14 from the

account. In both months, the Coastal HealthCare stock was

used to calculate the authorized limit for margin borrowing

and these purchases and withdrawals were made against these

erroneously inflated margin limits.

It is true, as Printy asserts, that Krmpotich and

other brokers from Dean Witter urged Printy to make stock

purchases on the basis of the Trust's borrowing limits. But

none of the brokers at Dean Witter knew of the error that

inflated the value of the Trust's assets. They assumed that

Dean Witter's monthly statements were accurate. The only one

who knew the monthly statements were grossly inaccurate was

Printy. In his deposition Printy testified that he had

questions about how his account was being handled. But he

never told Krmpotich that he did not own any stock in Coastal

-7- 7

HealthCare and that the authorized borrowing limits were

wrong.

Dean Witter finally corrected the error in the

February 1993 statement. The 150,000 shares of Coastal

HealthCare, with a value of $2,962,500.00, were debited from

the Trust account, and the 150,000 shares of Health Concepts,

with no value, were credited to it. Dean Witter also made a

margin call. After the margin call, the Trust's account had

a deficit of $600,230.82 that was not repaid to Dean Witter.

II. II.

LEGAL PROCEEDINGS LEGAL PROCEEDINGS 

On March 30, 1993, Dean Witter commenced an

arbitration proceeding against Printy, his sons, and the

Trust before the National Association of Securities Dealers.

The Statement of Claim consisted of eight counts, which

included counts for theft and receiving stolen property,

common-law fraud, violations of Minnesota securities law,

common-law conversion, and common-law replevin. Dean Witter

sought $603,548.00 in compensatory damages, plus interest and

attorney's fees, against all respondents. Punitive damages

were sought against Printy only.

Printy responded to the Statement of Claim and

raised a number of affirmative allegations. The defense

consisted of denial of wrongdoing and shifting the blame to

Dean Witter.

-8- 8

The arbitration award was issued on January 20,

1994. It found Printy, his sons as co-trustees, and the

Trust liable for compensatory damages in the amount of

$634,820.00 plus interest, from February 1, 1993, through the

date of payment of the award. The arbitration panel also

foundPrinty liableforpunitivedamagesintheamountof$375,000.00.

Printy filed a voluntary petition under Chapter 11

of the Bankruptcy Code prior to Dean Witter having the

arbitration award confirmed. Dean Witter obtained relief

from the automatic stay imposed under the Code. On January

30, 1995, the Hennepin County District Court for the Fourth

Judicial District of Minnesota confirmed the arbitration

award. Dean Witter filed an adversary proceeding against

Printy in bankruptcy court on August 24, 1994.

III. III.

ANALYSIS ANALYSIS 

The first issue is whether the bankruptcy debt

falls under 523(a)(2)(A) or 523(a)(6) of the Bankruptcy

Code. Section 523 of the Code provides in pertinent part:

523. Exceptions to discharge 523. Exceptions to discharge

(a) A discharge under section 727, (a)
1141, 1228(a), 1228(b), or 1328(b) of
this title does not discharge an
individual debtor from any debt--

(2) for money, property, services, (2)
or an extension, renewal, or refinancing
of credit, to the extent obtained by--

-9- 9

(A) false pretenses, a (A)
false representation, or actual
fraud, other than a statement
respecting the debtor's or an
insider's financial condition;

. . .

(6) for willful and malicious injury (6)
by the debtor to another entity or to the
property of another entity;

(Footnote omitted).

Printy argues that the sections are mutually

exclusive and the district court erred in proceeding under

(a)(6). This is an ingenious argument but it is convincingly

rebutted by the words of the statute and the case law. There

is no indication in 523 that Congress intended these two

sections to be mutually exclusive, nor does the legislative

history of the statute so suggest.

Printy candidly admits that, "[a] number of cases

have either applied both provisions to fraud claims or have

-10- 10

indicated an inclination to do so."2 The cases do hold as

Printy says.

Both parties have referred us to Grogan v. Garner, 

498 U.S. 279, 282 n.2 (1991), which states:

We therefore do not consider the
question whether 523(a)(2)(A) excepts
from discharge that part of a judgment in
excess of the actual value of money or
property received by a debtor by virtue
of fraud. See In re Rubin, 875 F.2d 755, 
758, n.1 (CA9 1989). Arguably, fraud
judgments in cases in which the defendant
did not obtain money, property, or
services from the plaintiffs and those
judgments that include punitive damages
awards are more appropriately governed by
523(a)(6). See 11 U.S.C. 523(a)(6)
(excepting from discharge debts "for
willful and malicious injury by the
debtor to another entity or to the
property of another entity"); In re 
Rubin, 875 F.2d, at 758, n. 1. 

 

2. Printy cites the following cases for this proposition:

See In re Stokes, 995 F.2d 76 (5th Cir. 
1993); In re Britton, 950 F.2d 602 (9th 
Cir. 1991); In re Apte, 180 B.R. 223 (BAP 
9th Cir. 1995); In re Dorsey, 162 B.R. 
150 (Bankr. N.D. Ill. 1993); In re 
Berman, 154 B.R. 991 (Bankr. S.D. Fla. 
1993); In re Horton, 152 B.R. 912 (Bankr. 
S.D. Tex. 1993); In re Iommazzo, 149 B.R. 
767 (Bankr. D.N.J. 1993); In re Sims, 148 
B.R. 553 (Bankr. E.D. Ark. 1992); In re 
Day, 137 B.R. 335 (Bankr. W.D. Mo. 1992); 
In re Powell, 95 B.R. 236 (Bankr. S.D. 
Fla.), aff'd, 108 B.R. 343 (S.D. Fla. 
1989), aff'd sub nom., Powell v. Bear, 
Stearns & Co., 914 F.2d 268 (11th Cir. 
1990).

Appellant's Br. at 11. 

-11- 11

We realize that this is not a precedential holding, but it

surely does not undercut the bankruptcy court's choice of

523(a)(6) as the relevant section under which to assess

Printy's conduct.

The bankruptcy court found that Printy "was using,

indeed converting Dean Witter's assets, not assets of the

Trust, to finance his trades and personal and family

expenditures." We agree. Viewing Printy's actions as the

tort of conversion, there are cases holding that conversion

falls within the ambit of 523(a)(6). See In re Stanley, 66 

F.3d 664, 668 (4th Cir. 1995); In re Lindberg, 49 B.R. 228 

(Bankr. D. Mass. 1985); In re Cardillo, 39 B.R. 548 (Bankr. 

D. Mass. 1984).

In In re Dorsey, 162 B.R. 150 (Bankr. N.D. Ill. 

1993), the bankruptcy court framed the issue as we see it:

[T]here is nothing in the text of section
523(a)(6) which precludes its proper
invocation by an aggrieved party whose
claim for willful and malicious injury
sounds in fraud. The critical focus for
relief under section 523(a)(6) for an
aggrieved creditor is the conduct
committed by the debtor, if found willful
and malicious under the facts, whether or
not such conduct might also fit within
one or more of the other exceptions to
discharge under section 523(a).

162 B.R. at 155-56.

Printy cites to In re Price, 123 B.R. 42 (Bankr. 

N.D. Ill. 1991), as precedent for its mutually exclusive

argument. Price, however, is the only case so holding and we 

-12- 12

decline to follow it. We hold that sections 523(a)(2)(A) and

(a)(6) are not mutually exclusive. It follows that the

bankruptcy court did not err in using 523(a)(6) as the

section applicable to Printy's conduct.

The next issue is whether there were sufficient

uncontroverted facts to establish that Printy's conduct

violated 523(a)(6). We start our analysis with an attempt

to determine the meaning of the words "willful and

malicious." The House Judiciary Committee's Report that

accompanied the passage of the 1978 Bankruptcy Code defined

"willful" as "deliberate or intentional" and stated that

"recklessness" was no longer the standard for "willfulness."

H.R. Rep. No. 95-595, at 365 (1977), reprinted in 1978 

U.S.C.C.A.N. 5787, 5963, 6320-21. This, however, is only the

beginning of our task.

As the bankruptcy court pointed out, there is

disagreement among the circuits as to whether the statute

requires an intentional act that results in an injury or one

done with the intention of causing an injury, with variations

on this theme. In Piccicuto v. Dwyer, 39 F.3d 37, 41 n.3 

(1st Cir. 1994), we noted "this difficult and controversial

issue." We declined to enter the fray, however, because the

parties had agreed on a definition which we used to decide

the case: "for an act to be willful and malicious under

523(a)(6), it must be 'deliberate,' 'wrongful,' and 'done

-13- 13

without regard to its consequences'. . . ." Id. at 41.  

That option is not available in this case.

We start with a survey of the cases. The rule in

the Eleventh Circuit is that "willful" means an intentional

or deliberate act, not done merely in reckless disregard of

the rights of another. In re Walker, 48 F.3d 1161, 1163 

(11th Cir. 1995). "Malicious" was defined as "wrongful and

without just cause or excessive even in the absence of

personal hatred, spite or ill-will." Id. at 1164 (internal 

quotation marks and citation omitted). Malice could be

implied or constructive; the specific intent to harm is not

necessary. Id. 

The Third Circuit in In re Conte, 33 F.3d 303, 305 

(3d Cir. 1994), held: "An injury is willful and malicious

under the Code only if the actor purposefully inflicted the

injury or acted with substantial certainty that injury would

result."

The rule of the Tenth Circuit is that "'willful and

malicious injury' occurs when the debtor, without

justification or excuse, and with full knowledge of the

specific consequences of his conduct, acts notwithstanding,

knowing full well that his conduct will cause particularized

injury." In re Pasek, 983 F.2d 1524, 1527 (10th Cir. 1993). 

-14- 14

The Sixth Circuit rule has been set forth in Vulcan 

Coals v. Howard, 946 F.2d 1226, 1228-29 (6th Cir. 1991):  

This court, when interpreting the terms
"willful" and "malicious" in 523(a)(6),
has held that a wrongful act done
intentionally, which necessarily produces
harm and is without just cause or excuse,
may constitute a willful and malicious
injury. We rejected the stricter
standard that "willful" and "malicious"
requires an act with intent to cause
injury.

(Citation omitted).

In re Littleton, 942 F.2d 551, 554 (9th Cir. 1991), 

states the Ninth Circuit standard: "Our court has adopted

the concept that 'the conversion of another's property

without his knowledge or consent, done intentionally and

without justification and excuse, to the other's injury,'

constitutes a willful and malicious injury within the meaning

of the 523(a)(6)." (Citations omitted).

The Fifth Circuit, in Chrysler Credit Corp. v. 

Perry Chrysler Plymouth, 783 F.2d 480, 486 (5th Cir. 1986), 

defined the words tersely: "'Willful' means intentional and

'malicious' means without just cause or excuse." (Footnote

omitted).

In St. Paul Fire & Marine Ins. Co. v. Vaughn, 779 

F.2d 1003 (4th Cir. 1985), the Fourth Circuit enunciated its

rule as follows. "[S]pecific or 'special' malice is not

required on the part of the debtor: 'if the act of

conversion is done deliberately and intentionally in knowing

-15- 15

disregard of the rights of another, it falls within the

statutory exclusion [from discharge in bankruptcy].'" Id. at 

1008 (citation omitted). 

We have chosen not to go back further than 1985 in

our review of circuit court cases. Our final case is,

therefore, In re Long, 774 F.2d 875, 881 (8th Cir. 1985), in 

which the Eighth Circuit stated: "When transfers in breach

of security agreements are in issue, we believe

nondischargeability turns on whether the conduct is (1)

headstrong and knowing ('willful') and, (2) targeted at the

creditor ('malicious'), at least in the sense that the

conduct is certain or almost certain to cause financial

harm."

The majority rule followed by the bankruptcy courts

for the District of Massachusetts can be stated as follows:

"[M]alicious" means an act done in
conscious disregard of one's duties. No
special malice toward the creditor need
be shown.

. . . 

[T]he term "willful and malicious" in
523(a)(6) means an act intentionally
committed, without just cause or excuse,
in conscious disregard of one's duty and
that necessarily produces an injury.

See In re Lubanski, 186 B.R. 160, 165 (Bankr. D. Mass. 1995). 

We adopt the rule of the Massachusetts bankruptcy

courts and the further refinement of it in Collier's

treatise on bankruptcy:

-16- 16

To fall within the exception of
section 523(a)(6), the injury to an
entity or property must have been willful
and malicious. An injury to an entity or
property may be a malicious injury within
this provision if it was wrongful and
without just cause or excuse, even in the
absence of personal hatred, spite or ill-
will.

The word "willfull" [sic] means
"deliberate or intentional," referring to
a deliberate and intentional act that
necessarily leads to injury. Therefore,
a wrongful act done intentionally, which
necessarily produces harm or which has a
substantial certainty of causing harm and
is without just cause or excuse, may be a
willful and malicious injury. While
something more than a mere voluntary act
is necessary to satisfy the scienter
requirement of section 523(a)(6),
specific intent to injure is not
necessary.

The malice element of section
523(a)(6) requires an intent to cause the
harm, and the fact that the injury was
caused through negligence or recklessness
does not satisfy that standard of proof.
An injury inflicted willfully and with
malice under section 523(a)(6) is one
inflicted intentionally and deliberately,
and either with the intent to cause the
harm complained of, or in circumstances
in which the harm was certain or almost
certain to result from the debtor's act.

4 Collier on Bankruptcy 523.12 (15th ed. 1996) (footnotes

omitted).

We agree with the bankruptcy court that, whatever

standard is applied here, summary judgment was warranted on

the uncontroverted facts. There can be no question that

Printy willfully and maliciously injured Dean Witter by not

-17- 17

informing it that a mistake had been made by crediting to the

Trust account the Coastal HealthCare stock that Printy knew

he did not own. Printy took advantage of Dean Witter's

computer error by borrowing against and withdrawing funds

from the false margin account that derived its value from

shares of stock that Printy knew he did not own. Such

conduct by Printy translates easily into an intent to

willfully and maliciously cause harm.

Printy attempts to blunt or obscure what he did by

arguing that Dean Witter did not prove that "its own conduct

was not an intervening cause in the creation of the debt."

Appellant's Br. at 21. Printy mischaracterizes what

happened. There is no question that Dean Witter's error gave

Printy the opportunity to use Dean Witter's assets for his

own gain. Printy saw the mistaken transfer of Coastal

HealthCare shares as a way to make some money quickly. To

put it bluntly, Printy saw a chance to make a killing at Dean

Witter's expense and he took it. There was no intervening

cause. The sole proximate cause was Printy's greed.

The final issue we discuss is whether the

bankruptcy court erred in ruling that Printy's counterclaims

were barred by res judicata because they were decided against 

Printy in the arbitration proceedings.

Count I of the counterclaim asserts breach of

contract by Dean Witter. The essence of the claim is that

-18- 18

Dean Witter agreed that it would accurately administer the

Trust account and failed to do so. It is specifically

alleged that Dean Witter refused to correct the statements in

the Trust account when "its errors were called to its

attention." And it is alleged that Dean Witter's broker,

Krmpotich, "induced and recommended that the Family Trust

engage in transactions based on the statements as provided by

Dean Witter." There are four other allegations in this count

that do not warrant further discussion.3

The specific allegation in the counterclaim that

Dean Witter refused to correct the statements in the Trust

account "when its errors were called to its attention" has no

support in the record. In fact, the record is directly to

the contrary. At his deposition Printy admitted that at no

time did he tell Krmpotich or his assistant that he did not

own any stock in Coastal HealthCare, and that the stock the

Trust held was Health Concepts, whose value was de minimis 

compared to the three to four million dollar value of Coastal

HealthCare. We find that there is no basis in the record for

Count I of the counterclaim.

 

3. "(9) Failure by Dean Witter to supervise its Midwest
Operations Center; (10) failure to supervise broker
Krmpotich; (11) breach of the implied covenant of good faith
and fair dealing; and (12) that as a result, Printy was
damaged."

-19- 19

Count II of the counterclaim sounds in negligence.

It alleges that because of Dean Witter's negligence Printy

incurred damages. We have already disposed of the negligence

claim of Printy. It has no merit either legally or

factually.

Count III alleges a breach by Dean Witter of its

duty of good faith and fair dealing. This claim is based on

the following assertions:

16. As part of the arbitration with
Printy, Dean Witter sought punitive
damages.

17. Dean Witter has taken the position
throughout the country in other
arbitrations pursuant to its customer
agreements that punitive damages are not
available under New York law or any other
law.

18. Dean Witter has stated publicly its
view that punitive damages are not
available in arbitrations pursuant to its
customer agreements.

19. Having taken this position as a
matter of its consistent practice, Dean
Witter is acting in bad faith to seek
punitive damages against Printy. Its
attempt to recover such damages is
fundamentally unfair and discriminatory.

20. As a result of Dean Witter's
actions, Printy has been damaged.

Printy has cited no cases supporting this novel

claim. We have not looked for any. We have found nothing in

the record that would factually support the statements made

-20- 20

in paragraphs 17 and 18. We find that this claim, like the

others asserted in the counterclaim, has no merit.

We also agree with the bankruptcy court that the

doctrine of res judicata bars consideration of the 

counterclaim because the issues asserted in the counterclaim

were also raised as affirmative allegations in the

arbitration proceedings. In Pujol v. Shearson/American Exp., 

829 F.2d 1201, 1208 (1st Cir. 1987), we held that where a

party had the "full power" to press its claim in the

arbitration proceeding, "[t]he arbitration decision,

therefore, stands as a res judicata bar to these claims." 

See also Aunyx Corp. v. Canon U.S.A., 978 F.2d 3, 6-7 (1st 

Cir. 1992).

The summary judgment issued by the bankruptcy court

and affirmed by the district court is Affirmed. Affirmed 

-21- 21