USCA1 Opinion

 

 United States Court of Appeals For the First Circuit For the First Circuit ____________________ No. 96-2195 DAVID L. PRINTY, Appellant, v. DEAN WITTER REYNOLDS, INC., Appellee. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Nancy Gertner, U.S. District Judge] ___________________ ____________________ Before Boudin, Circuit Judge, _____________ Bownes, Senior Circuit Judge, ____________________ and Lynch, Circuit Judge. _____________ ____________________ Evan Slavitt, with whom Joseph S.U. Bodoff, and Hinckley, Allen, ____________ ___________________ _________________ & Snyder were on brief for appellant. ________ Mary DeNevi, with whom Bingham, Dana & Gould LLP were on brief ___________ ___________________________ for appellee. ____________________ April 10, 1997 ____________________ BOWNES, Senior Circuit Judge. The overarching BOWNES, Senior Circuit Judge. _____________________ issue in this bankruptcy case is whether an arbitration award of $1,009,820.00, made by a panel of the National Association of Securities Dealers to appellee Dean Witter Reynolds, Inc., against appellant David L. Printy is a non-dischargeable debt under Chapter 11 of the Bankruptcy Code. The district court affirmed an opinion of the bankruptcy court holding, on a summary judgment motion, that the debt was non-dischargeable. We affirm. There are a number of subsidiary issues which we address in the course of our opinion. Because the appeal is from the grant of a motion for summary judgment, our review is de novo on all issues. _______ Hope Furnace Assocs., Inc. v. FDIC, 71 F.3d 39, 42-43 (1st ____________________________________ Cir. 1995); Alexis v. McDonald's Restaurants of Mass., 67 ____________________________________________ F.3d 341, 346 (1st Cir. 1995); In re Varrasso, 37 F.3d 760, _______________ 762-63 (1st Cir. 1994). I. I. THE FACTS THE FACTS _________ We start with the facts, keeping in mind the strictures of Fed. R. Civ. P. 56(c).1 Printy and his two  ____________________ 1. The rule states in pertinent part: The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a -2- 2 sons were the co-trustees of The Andrea L. Printy Family Trust, (the Trust) which had been established in 1986 after the death of Printy's wife. Printy was an experienced investor and knowledgeable in the finance field. At the time of discovery in this case he was a business consultant with eighteen years' experience in financial services. He had been issued a broker's license and had held management positions in several financial services companies. On August 26, 1992, Printy transferred the Trust's account to the office of Dean Witter in Minneapolis, Minnesota. The record shows that Printy made all the decisions about the Trust; the sons play no part in this case. Dean Witter is a national broker-dealer in securities. It is registered with the Securities and Exchange Commission and is a member of the National Association of Securities Dealers. The account was opened in the name of the Trust and funded with a deposit of $50,000.00. The account executive at Dean Witter in charge of the Trust account was Michael Krmpotich. He and Printy were acquainted. Printy had tried to persuade Krmpotich to join a broker-dealer company in New Ulm, Minnesota, with which Printy had been affiliated. It was Krmpotich who had solicited the Trust account.  ____________________ judgment as a matter of law. -3- 3 Printy executed an Active Assets Account Agreement with Dean Witter, effective September 30, 1992. Under the terms of the agreement, any controversies relative to the account were subject to arbitration. The Active Assets Account permitted the holder to buy and sell securities. The account holder could also write checks on, or receive wire transfers from, the Account. Additionally, the securities held in the account could be used as collateral for borrowing funds from Dean Witter "on margin" in order to purchase additional securities or for other reasons. The amount of money Dean Witter would permit an account holder to borrow on margin was calculated based on the value of the assets held in the account. Under the agreement, if the Trust owed money to Dean Witter for margin borrowing or other reasons, Dean Witter was entitled to a security interest in any securities or property held in the Trust's account. In early September of 1992, Dean Witter received the following assets from the Trust: a U.S. Treasury Note and stock holdings in: Baxter International, Inc., Marion Merrill Dow, Inc., Vital Heart Systems, Inc., Eastman Kodak Co., Weyerhaeuser Co., Bank America Corp., and J. P. Morgan & Co. In addition to these assets, Dean Witter received 150,000 shares of Health Concepts, Inc. and an interest in MCI Medical Seed Limited Partnership. Printy was the president, secretary, and a shareholder of Health Concepts. -4- 4 He knew that the stock was not traded on any exchange or over-the-counter market and had very little value, if any. The bankruptcy judge points out in connection with Printy's bankruptcy schedules that in Schedule B - Personal Property - Printy gave a zero value to his holdings in Health Concepts and did not discuss the stock at all in the liquidation analysis section of his Disclosure Statement submitted with his Plan of Reorganization.  As part of its services, Dean Witter sent Printy monthly statements detailing and summarizing the Trust's assets. As of September 30, 1992, the Dean Witter statement showed the market value of the Trust's assets to be $191,533.33, with a borrowing limit of $141,104.50. The statement did not reflect the receipt of the Health Concepts stock or the interest in the MCI Medical Seed Partnership. Next comes the event that led to this law suit. The Dean Witter statement for the month of October 1992 showed receipt by the Trust on October 28, 1992 of 150,000 shares of Coastal HealthCare stock with a value of $3,637,500.00. Coastal HealthCare stock is publicly traded. In his deposition testimony Printy stated that he did not authorize the purchase of the Coastal HealthCare stock and never received stock-purchase confirmation slips. The reason for this obviously mistaken increase of over three and one half million dollars in the asset value of the Trust was a -5- 5 computer error by Dean Witter. The Trust's virtually worthless Health Concepts shares had been given the computer code for Coastal HealthCare shares, thus attributing to the Trust ownership of Coastal HealthCare stock, which it did not own. On November 16, 1992, Printy sent a fax to the Trust's account broker, Krmpotich, and his assistant, Lynn Jorgenson, asking that 15,000 shares of Coastal HealthCare be delivered to him but left in the name of the Trust. Jorgenson informed Printy that Dean Witter could not deliver anything but the entire holding of 150,000 shares. Printy authorized the delivery of the 150,000 shares. In due time, he received a certificate for 150,000 shares of Health Concepts, not the Coastal HealthCare shares he had requested. The computer mix-up between Health Concepts and Coastal HealthCare continued through November of 1992. The November 1992 statement showed that 150,000 shares of Coastal HealthCare valued at $3,712,500.00 had been debited from the account. As a result, the total asset value of the Trust shrunk to $100,475.00 from the October value of $3,775,925.00. Printy returned the 150,000 shares certificate of Health Concepts to Dean Witter on December 1, 1992. The computer continued on its merry way in the wrong direction. The Dean Witter December 1992 statement showed the Trust's -6- 6 receipt on December 2 of 150,000 shares of Coastal HealthCare, with an increase in asset value from $100,475.00 to $4,984,275.00. The December statement, however, showed more than the return of the Coastal HealthCare stock to the Trust account. It showed that Printy purchased a total of 22,409 shares of stock in twelve companies and withdrew through wire transfers or checks, $262,501.11 from the account. In January of 1993, Printy bought a total of 16,763 shares of stock in eight companies and withdrew $373,670.14 from the account. In both months, the Coastal HealthCare stock was used to calculate the authorized limit for margin borrowing and these purchases and withdrawals were made against these erroneously inflated margin limits. It is true, as Printy asserts, that Krmpotich and other brokers from Dean Witter urged Printy to make stock purchases on the basis of the Trust's borrowing limits. But none of the brokers at Dean Witter knew of the error that inflated the value of the Trust's assets. They assumed that Dean Witter's monthly statements were accurate. The only one who knew the monthly statements were grossly inaccurate was Printy. In his deposition Printy testified that he had questions about how his account was being handled. But he never told Krmpotich that he did not own any stock in Coastal -7- 7 HealthCare and that the authorized borrowing limits were wrong. Dean Witter finally corrected the error in the February 1993 statement. The 150,000 shares of Coastal HealthCare, with a value of $2,962,500.00, were debited from the Trust account, and the 150,000 shares of Health Concepts, with no value, were credited to it. Dean Witter also made a margin call. After the margin call, the Trust's account had a deficit of $600,230.82 that was not repaid to Dean Witter. II. II. LEGAL PROCEEDINGS LEGAL PROCEEDINGS _________________ On March 30, 1993, Dean Witter commenced an arbitration proceeding against Printy, his sons, and the Trust before the National Association of Securities Dealers. The Statement of Claim consisted of eight counts, which included counts for theft and receiving stolen property, common-law fraud, violations of Minnesota securities law, common-law conversion, and common-law replevin. Dean Witter sought $603,548.00 in compensatory damages, plus interest and attorney's fees, against all respondents. Punitive damages were sought against Printy only. Printy responded to the Statement of Claim and raised a number of affirmative allegations. The defense consisted of denial of wrongdoing and shifting the blame to Dean Witter. -8- 8 The arbitration award was issued on January 20, 1994. It found Printy, his sons as co-trustees, and the Trust liable for compensatory damages in the amount of $634,820.00 plus interest, from February 1, 1993, through the date of payment of the award. The arbitration panel also foundPrinty liableforpunitivedamagesintheamountof$375,000.00. Printy filed a voluntary petition under Chapter 11 of the Bankruptcy Code prior to Dean Witter having the arbitration award confirmed. Dean Witter obtained relief from the automatic stay imposed under the Code. On January 30, 1995, the Hennepin County District Court for the Fourth Judicial District of Minnesota confirmed the arbitration award. Dean Witter filed an adversary proceeding against Printy in bankruptcy court on August 24, 1994. III. III. ANALYSIS ANALYSIS ________ The first issue is whether the bankruptcy debt falls under 523(a)(2)(A) or 523(a)(6) of the Bankruptcy Code. Section 523 of the Code provides in pertinent part: 523. Exceptions to discharge 523. Exceptions to discharge (a) A discharge under section 727, (a) 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt-- (2) for money, property, services, (2) or an extension, renewal, or refinancing of credit, to the extent obtained by-- -9- 9 (A) false pretenses, a (A) false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition; . . . (6) for willful and malicious injury (6) by the debtor to another entity or to the property of another entity; (Footnote omitted). Printy argues that the sections are mutually exclusive and the district court erred in proceeding under (a)(6). This is an ingenious argument but it is convincingly rebutted by the words of the statute and the case law. There is no indication in 523 that Congress intended these two sections to be mutually exclusive, nor does the legislative history of the statute so suggest. Printy candidly admits that, "[a] number of cases have either applied both provisions to fraud claims or have -10- 10 indicated an inclination to do so."2 The cases do hold as Printy says. Both parties have referred us to Grogan v. Garner, ________________ 498 U.S. 279, 282 n.2 (1991), which states: We therefore do not consider the question whether 523(a)(2)(A) excepts from discharge that part of a judgment in excess of the actual value of money or property received by a debtor by virtue of fraud. See In re Rubin, 875 F.2d 755, ___________ 758, n.1 (CA9 1989). Arguably, fraud judgments in cases in which the defendant did not obtain money, property, or services from the plaintiffs and those judgments that include punitive damages awards are more appropriately governed by 523(a)(6). See 11 U.S.C. 523(a)(6) (excepting from discharge debts "for willful and malicious injury by the debtor to another entity or to the property of another entity"); In re ______ Rubin, 875 F.2d, at 758, n. 1. _____  ____________________ 2. Printy cites the following cases for this proposition: See In re Stokes, 995 F.2d 76 (5th Cir. ___ _____________ 1993); In re Britton, 950 F.2d 602 (9th ______________ Cir. 1991); In re Apte, 180 B.R. 223 (BAP __________ 9th Cir. 1995); In re Dorsey, 162 B.R. _____________ 150 (Bankr. N.D. Ill. 1993); In re ______ Berman, 154 B.R. 991 (Bankr. S.D. Fla. ______ 1993); In re Horton, 152 B.R. 912 (Bankr. ____________ S.D. Tex. 1993); In re Iommazzo, 149 B.R. ______________ 767 (Bankr. D.N.J. 1993); In re Sims, 148 __________ B.R. 553 (Bankr. E.D. Ark. 1992); In re _____ Day, 137 B.R. 335 (Bankr. W.D. Mo. 1992); ___ In re Powell, 95 B.R. 236 (Bankr. S.D. _____________ Fla.), aff'd, 108 B.R. 343 (S.D. Fla. _____ 1989), aff'd sub nom., Powell v. Bear, _______________ ________________ Stearns & Co., 914 F.2d 268 (11th Cir. ______________ 1990). Appellant's Br. at 11.  -11- 11 We realize that this is not a precedential holding, but it surely does not undercut the bankruptcy court's choice of 523(a)(6) as the relevant section under which to assess Printy's conduct. The bankruptcy court found that Printy "was using, indeed converting Dean Witter's assets, not assets of the Trust, to finance his trades and personal and family expenditures." We agree. Viewing Printy's actions as the tort of conversion, there are cases holding that conversion falls within the ambit of 523(a)(6). See In re Stanley, 66 ___ _____________ F.3d 664, 668 (4th Cir. 1995); In re Lindberg, 49 B.R. 228 ______________ (Bankr. D. Mass. 1985); In re Cardillo, 39 B.R. 548 (Bankr. ______________ D. Mass. 1984). In In re Dorsey, 162 B.R. 150 (Bankr. N.D. Ill. _____________ 1993), the bankruptcy court framed the issue as we see it: [T]here is nothing in the text of section 523(a)(6) which precludes its proper invocation by an aggrieved party whose claim for willful and malicious injury sounds in fraud. The critical focus for relief under section 523(a)(6) for an aggrieved creditor is the conduct committed by the debtor, if found willful and malicious under the facts, whether or not such conduct might also fit within one or more of the other exceptions to discharge under section 523(a). 162 B.R. at 155-56. Printy cites to In re Price, 123 B.R. 42 (Bankr. ___________ N.D. Ill. 1991), as precedent for its mutually exclusive argument. Price, however, is the only case so holding and we _____ -12- 12 decline to follow it. We hold that sections 523(a)(2)(A) and (a)(6) are not mutually exclusive. It follows that the bankruptcy court did not err in using 523(a)(6) as the section applicable to Printy's conduct. The next issue is whether there were sufficient uncontroverted facts to establish that Printy's conduct violated 523(a)(6). We start our analysis with an attempt to determine the meaning of the words "willful and malicious." The House Judiciary Committee's Report that accompanied the passage of the 1978 Bankruptcy Code defined "willful" as "deliberate or intentional" and stated that "recklessness" was no longer the standard for "willfulness." H.R. Rep. No. 95-595, at 365 (1977), reprinted in 1978 _____________ U.S.C.C.A.N. 5787, 5963, 6320-21. This, however, is only the beginning of our task. As the bankruptcy court pointed out, there is disagreement among the circuits as to whether the statute requires an intentional act that results in an injury or one done with the intention of causing an injury, with variations on this theme. In Piccicuto v. Dwyer, 39 F.3d 37, 41 n.3 ___________________ (1st Cir. 1994), we noted "this difficult and controversial issue." We declined to enter the fray, however, because the parties had agreed on a definition which we used to decide the case: "for an act to be willful and malicious under 523(a)(6), it must be 'deliberate,' 'wrongful,' and 'done -13- 13 without regard to its consequences'. . . ." Id. at 41.  ___ That option is not available in this case. We start with a survey of the cases. The rule in the Eleventh Circuit is that "willful" means an intentional or deliberate act, not done merely in reckless disregard of the rights of another. In re Walker, 48 F.3d 1161, 1163 _____________ (11th Cir. 1995). "Malicious" was defined as "wrongful and without just cause or excessive even in the absence of personal hatred, spite or ill-will." Id. at 1164 (internal ___ quotation marks and citation omitted). Malice could be implied or constructive; the specific intent to harm is not necessary. Id. ___ The Third Circuit in In re Conte, 33 F.3d 303, 305 ___________ (3d Cir. 1994), held: "An injury is willful and malicious under the Code only if the actor purposefully inflicted the injury or acted with substantial certainty that injury would result." The rule of the Tenth Circuit is that "'willful and malicious injury' occurs when the debtor, without justification or excuse, and with full knowledge of the specific consequences of his conduct, acts notwithstanding, knowing full well that his conduct will cause particularized injury." In re Pasek, 983 F.2d 1524, 1527 (10th Cir. 1993). ___________ -14- 14 The Sixth Circuit rule has been set forth in Vulcan ______ Coals v. Howard, 946 F.2d 1226, 1228-29 (6th Cir. 1991):  _______________ This court, when interpreting the terms "willful" and "malicious" in 523(a)(6), has held that a wrongful act done intentionally, which necessarily produces harm and is without just cause or excuse, may constitute a willful and malicious injury. We rejected the stricter standard that "willful" and "malicious" requires an act with intent to cause injury. (Citation omitted). In re Littleton, 942 F.2d 551, 554 (9th Cir. 1991), _______________ states the Ninth Circuit standard: "Our court has adopted the concept that 'the conversion of another's property without his knowledge or consent, done intentionally and without justification and excuse, to the other's injury,' constitutes a willful and malicious injury within the meaning of the 523(a)(6)." (Citations omitted). The Fifth Circuit, in Chrysler Credit Corp. v. __________________________ Perry Chrysler Plymouth, 783 F.2d 480, 486 (5th Cir. 1986), ________________________ defined the words tersely: "'Willful' means intentional and 'malicious' means without just cause or excuse." (Footnote omitted). In St. Paul Fire & Marine Ins. Co. v. Vaughn, 779 ___________________________________________ F.2d 1003 (4th Cir. 1985), the Fourth Circuit enunciated its rule as follows. "[S]pecific or 'special' malice is not required on the part of the debtor: 'if the act of conversion is done deliberately and intentionally in knowing -15- 15 disregard of the rights of another, it falls within the statutory exclusion [from discharge in bankruptcy].'" Id. at ___ 1008 (citation omitted).  We have chosen not to go back further than 1985 in our review of circuit court cases. Our final case is, therefore, In re Long, 774 F.2d 875, 881 (8th Cir. 1985), in __________ which the Eighth Circuit stated: "When transfers in breach of security agreements are in issue, we believe nondischargeability turns on whether the conduct is (1) headstrong and knowing ('willful') and, (2) targeted at the creditor ('malicious'), at least in the sense that the conduct is certain or almost certain to cause financial harm." The majority rule followed by the bankruptcy courts for the District of Massachusetts can be stated as follows: "[M]alicious" means an act done in conscious disregard of one's duties. No special malice toward the creditor need be shown. . . .  [T]he term "willful and malicious" in 523(a)(6) means an act intentionally committed, without just cause or excuse, in conscious disregard of one's duty and that necessarily produces an injury. See In re Lubanski, 186 B.R. 160, 165 (Bankr. D. Mass. 1995). ___ ______________ We adopt the rule of the Massachusetts bankruptcy courts and the further refinement of it in Collier's treatise on bankruptcy: -16- 16 To fall within the exception of section 523(a)(6), the injury to an entity or property must have been willful and malicious. An injury to an entity or property may be a malicious injury within this provision if it was wrongful and without just cause or excuse, even in the absence of personal hatred, spite or ill- will. The word "willfull" [sic] means "deliberate or intentional," referring to a deliberate and intentional act that necessarily leads to injury. Therefore, a wrongful act done intentionally, which necessarily produces harm or which has a substantial certainty of causing harm and is without just cause or excuse, may be a willful and malicious injury. While something more than a mere voluntary act is necessary to satisfy the scienter requirement of section 523(a)(6), specific intent to injure is not necessary. The malice element of section 523(a)(6) requires an intent to cause the harm, and the fact that the injury was caused through negligence or recklessness does not satisfy that standard of proof. An injury inflicted willfully and with malice under section 523(a)(6) is one inflicted intentionally and deliberately, and either with the intent to cause the harm complained of, or in circumstances in which the harm was certain or almost certain to result from the debtor's act. 4 Collier on Bankruptcy 523.12 (15th ed. 1996) (footnotes omitted). We agree with the bankruptcy court that, whatever standard is applied here, summary judgment was warranted on the uncontroverted facts. There can be no question that Printy willfully and maliciously injured Dean Witter by not -17- 17 informing it that a mistake had been made by crediting to the Trust account the Coastal HealthCare stock that Printy knew he did not own. Printy took advantage of Dean Witter's computer error by borrowing against and withdrawing funds from the false margin account that derived its value from shares of stock that Printy knew he did not own. Such conduct by Printy translates easily into an intent to willfully and maliciously cause harm. Printy attempts to blunt or obscure what he did by arguing that Dean Witter did not prove that "its own conduct was not an intervening cause in the creation of the debt." Appellant's Br. at 21. Printy mischaracterizes what happened. There is no question that Dean Witter's error gave Printy the opportunity to use Dean Witter's assets for his own gain. Printy saw the mistaken transfer of Coastal HealthCare shares as a way to make some money quickly. To put it bluntly, Printy saw a chance to make a killing at Dean Witter's expense and he took it. There was no intervening cause. The sole proximate cause was Printy's greed. The final issue we discuss is whether the bankruptcy court erred in ruling that Printy's counterclaims were barred by res judicata because they were decided against ___ ________ Printy in the arbitration proceedings. Count I of the counterclaim asserts breach of contract by Dean Witter. The essence of the claim is that -18- 18 Dean Witter agreed that it would accurately administer the Trust account and failed to do so. It is specifically alleged that Dean Witter refused to correct the statements in the Trust account when "its errors were called to its attention." And it is alleged that Dean Witter's broker, Krmpotich, "induced and recommended that the Family Trust engage in transactions based on the statements as provided by Dean Witter." There are four other allegations in this count that do not warrant further discussion.3 The specific allegation in the counterclaim that Dean Witter refused to correct the statements in the Trust account "when its errors were called to its attention" has no support in the record. In fact, the record is directly to the contrary. At his deposition Printy admitted that at no time did he tell Krmpotich or his assistant that he did not own any stock in Coastal HealthCare, and that the stock the Trust held was Health Concepts, whose value was de minimis __ _______ compared to the three to four million dollar value of Coastal HealthCare. We find that there is no basis in the record for Count I of the counterclaim.  ____________________ 3. "(9) Failure by Dean Witter to supervise its Midwest Operations Center; (10) failure to supervise broker Krmpotich; (11) breach of the implied covenant of good faith and fair dealing; and (12) that as a result, Printy was damaged." -19- 19 Count II of the counterclaim sounds in negligence. It alleges that because of Dean Witter's negligence Printy incurred damages. We have already disposed of the negligence claim of Printy. It has no merit either legally or factually. Count III alleges a breach by Dean Witter of its duty of good faith and fair dealing. This claim is based on the following assertions: 16. As part of the arbitration with Printy, Dean Witter sought punitive damages. 17. Dean Witter has taken the position throughout the country in other arbitrations pursuant to its customer agreements that punitive damages are not available under New York law or any other law. 18. Dean Witter has stated publicly its view that punitive damages are not available in arbitrations pursuant to its customer agreements. 19. Having taken this position as a matter of its consistent practice, Dean Witter is acting in bad faith to seek punitive damages against Printy. Its attempt to recover such damages is fundamentally unfair and discriminatory. 20. As a result of Dean Witter's actions, Printy has been damaged. Printy has cited no cases supporting this novel claim. We have not looked for any. We have found nothing in the record that would factually support the statements made -20- 20 in paragraphs 17 and 18. We find that this claim, like the others asserted in the counterclaim, has no merit. We also agree with the bankruptcy court that the doctrine of res judicata bars consideration of the ___ ________ counterclaim because the issues asserted in the counterclaim were also raised as affirmative allegations in the arbitration proceedings. In Pujol v. Shearson/American Exp., _______________________________ 829 F.2d 1201, 1208 (1st Cir. 1987), we held that where a party had the "full power" to press its claim in the arbitration proceeding, "[t]he arbitration decision, therefore, stands as a res judicata bar to these claims." ___ ________ See also Aunyx Corp. v. Canon U.S.A., 978 F.2d 3, 6-7 (1st ___ ____ ____________________________ Cir. 1992). The summary judgment issued by the bankruptcy court and affirmed by the district court is Affirmed. Affirmed ________ -21- 21