USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 95-1505 HOPE FURNACE ASSOCIATES, INC., Plaintiff - Appellant, v. FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver of Eastland Bank & Eastland Savings Bank, Defendant - Appellee. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND [Hon. Raymond J. Pettine, Senior U.S. District Judge] __________________________ ____________________ Before Torruella, Chief Judge, ___________ Lynch, Circuit Judge, _____________ and Stearns,* District Judge. ______________ _____________________ Karen A. Pelczarski, with whom John H. Blish and Blish & ___________________ _____________ ________ Cavanagh were on brief for appellant. ________ Kathleen V. Gunning, Appellate Litigation Section, Federal ____________________ Deposit Insurance Corporation, with whom Ann S. DuRoss, Assistant _____________ General Counsel, Colleen B. Bombardier, Senior Counsel, John P. _____________________ _______ Parker, Senior Attorney, Federal Deposit Insurance Corporation, ______ Christopher M. Neronha, Hinckley, Allen & Snyder and John P. _______________________ __________________________ _______ Parker were on brief for appellee. ______ ____________________ December 6, 1995 ____________________  ____________________ * Of the District of Massachusetts, sitting by designation. STEARNS, District Judge. The plaintiff-appellant, Hope STEARNS, District Judge. ______________ Furnace Associates, Inc. ("Hope"), appeals from the entry of summary judgment against it, claiming that Eastland Savings Bank ("Eastland"), the FDIC's predecessor in interest, reneged on a binding commitment to finance a Hope real estate development. We disagree and affirm the judgment of the district court, although on a different ground than the one articulated by that court. BACKGROUND BACKGROUND __________ Hope originally brought suit in Rhode Island Superior Court. Eastland was afterwards declared insolvent by the Rhode Island Director of Business Regulation. The FDIC, appointed as Eastland's receiver, removed the case to the federal district court in Rhode Island where, in due course, cross-motions for summary judgment were heard. Hope accused Eastland of defaulting on its obligations under a loan commitment letter by pretextually demanding that Hope obtain an unobtainable state environmental approval. The FDIC argued that because Hope was not designated as the borrower in the commitment letter, it was barred from maintaining the action by the D'Oench, Duhme doctrine and 12 U.S.C. 1823(e). _______ _____ The FDIC also contended that Hope had defaulted on several conditions precedent of the agreement, thus relieving Eastland of any duty to perform. The district court adopted the D'Oench, Duhme argument _______ _____ proffered by the FDIC and granted it summary judgment. The district judge reasoned that the loan commitment had been -2- expressly extended to ENDA Associates, Inc., a partnership affiliated with, but juridically independent from Hope. Hope pointed unavailingly to bank records and to written admissions by bank officials that should have alerted the FDIC to the fact that the insertion of ENDA's name in the letter was the result of a clerical blunder. The district court did not find it necessary to address the contract issue, although it had been fully briefed. In light of the contemporaneous verification in Eastland's records of Hope as the actual borrower, the FDIC no longer relies on the D'Oench, Duhme argument. In its brief, the _______ _____ FDIC candidly and commendably makes the following concession. The FDIC does not contend on appeal that section 1823(e) [or D'Oench, Duhme] applies _______ _____ to bar Hope Furnace's assertion that it, rather than ENDA, was the true borrower under [the] Commitment Letter, or that it is the proper party to contend that the Bank breached its obligations thereunder. Here, the record appears to reveal the clear intent of the parties that Hope Furnace, rather than ENDA, was the intended borrower despite the Commitment Letter's express provisions to the contrary. Appellee's Brief, at 13-14. The sole issue on appeal, therefore, is whether the alternative ground for summary judgment urged by the FDIC before the district court is valid. See Mesnick v. General Electric _______ _________________ Co., 950 F.2d 816, 822 (1st Cir. 1991). ___ FACTS FACTS _____ The commitment letter was signed on April 4, 1989. Eastland promised to lend $1.5 million to finance a planned -3- development in Scituate, Rhode Island, if Hope succeeded in fulfilling certain conditions by June 5, 1989. On July 26, 1989, Eastland extended the compliance date to August 31, 1989. Ender Ozsezen and David Verardo, the joint principals of Hope and ENDA, agreed to personally guarantee the loan. The commitment letter required that the loan be cross-collateralized and cross- defaulted with an outstanding loan to an ENDA condominium project (the Tamarac loan) on which a balance was then owing of $572,195. Hope planned to subdivide a 125 acre parcel of undeveloped land into fifty-six single family lots. At least sixteen of the lots were to have municipal water. The remaining lots would require more expensive groundwater wells. Approximately $300,000 of the loan proceeds were to be used to install the municipal water connections. This entailed laying two pipelines, each extending some 3,000 feet from the parcel. At the time the commitment letter was signed, it was unclear whether construction of the connectors would impact an adjacent wetlands, a matter of no small concern to Eastland.1 The commitment letter imposed two pertinent conditions. First, that Hope obtain a letter from the Rhode Island Department of Environmental Management ("DEM") "indicating that a Request for Applicability Determination has been filed with said  ____________________ 1 Eastland made clear this concern in the opening paragraph of the loan commitment letter by including municipal water access in its definition of the subject parcel. "It is our understanding that the property securing this loan consists of a parcel of land containing approximately 125 acres and that it will be developed into 16 buildable lots ranging in size from 1 1/2 to 2 1/2 acres each with adequate road frontage and municipal water service." -4- department and that the subject parcel of land does not require a Permit to Alter Wetlands." (Paragraph 37). And second, that Hope provide Eastland with a certificate of a registered engineer verifying the availability of utility service, storm drainage facilities, sewerage connections and "such other facilities as may be deemed necessary by the bank." (Paragraph 27).2 The commitment letter also contained several clauses giving Eastland discretion to determine whether or not these conditions had been met. Paragraph 39 provided that: [t]he Bank shall reserve the right to cancel and to terminate its obligations under this commitment if any of the following occur: a. Failure of the borrowers to comply, or cause to be complied within the time specified with any of the provisions or conditions applicable to this commitment. . . . f. Any change subsequent to this commitment deemed by the Bank to be material or substantial in the assets, net worth or credit standing of any borrower or other person who shall become obligated to the Bank under this commitment, or the taking of a judgment against any said person which, in the sole discretion of the Bank, materially affect his credit standing . . . . Finally, the letter stated that "[t]his commitment cannot be changed, discharged, or terminated orally but only by an  ____________________ 2 The FDIC also claims that Hope breached Paragraph 38 of the letter which required that Hope maintain any property in which Eastland had a security interest (including Tamarac) free of liens over the life of the loan. Hope argues, not implausibly, that it was never in breach of Paragraph 38 because the loan was never made. Moreover, Hope alleges that it had filed releases on all liens on the Tamarac property on or before July 28, 1989. -5- instrument in writing signed by the party against whom endorsement of any change, discharge or termination is sought." (Paragraph 46). Eastland's attorney, Robert Branca, provided Hope with a draft of an engineer's certificate that Eastland would deem to satisfy Paragraph 27 (and by implication, Paragraph 37) of the commitment letter, namely [t]hat construction and operation of the Improvements will not involve the filling or alteration of any stream, brook or other body of water or any wetlands area nor the discharge of any fill or other material into the ground water . . . . Hope's engineer meanwhile determined that installation of the municipal water connectors would in fact have a disruptive impact on the neighboring wetlands. Consequently, he refused to sign a certificate in the form dictated by Eastland. On May 31, 1989, Branca, having been made aware of the engineer's refusal, provided Hope with a second, more flexibly worded draft. It stated, in pertinent part,  [t]hat construction and operation of the Improvements will not involve the filling or alteration of any . . . wetlands area nor the discharge of any fill or other material into the ground water, except as hereinafter set forth. The construction of the portion of the Improvements involving construction of the water line along Hope Furnace Road from Route 116 to the Premises will require stream crossings, and as such, come under the jurisdiction of the [DEM]. In our professional opinion, we and the Borrower can work with DEM incorporating any suggestions it may make (without unusual measures being taken or unusual costs being incurred) in order for DEM to make a determination that such construction involves an insignificant -6- alteration of freshwater wetlands. There is presently pending with DEM an application for a determination of the impact on freshwater wetlands of such construction and in our experience, the same should be granted in 90 days . . . .  While the language of an acceptable certificate was being negotiated, Hope's engineer declared bankruptcy. Before Hope's new engineer (Gerhard Graf) could complete his investigation, Eastland resolved to reject any engineer's certificate that contemplated even an "insignificant" wetlands alteration unless Hope obtained prior DEM approval. On August 17, 1989, Eastland warned Verardo that payments on the cross-collateralized Tamarac loan were past due and reaffirmed the August 31, 1984 deadline for compliance with the conditions of the commitment letter. Eastland also demanded that Verardo "respond by August 25, 1989 as to how you plan to resolve these issues." On August 19, 1989, DEM notified Verardo that "[b]ased upon our observations and review, it is our conclusion that Fresh Water Wetlands, as described by Section 2- 1-20 of the Fresh Water Wetlands Act, are present on or adjacent to the subject property. These wetlands do fall under the protection of the Department. . . . The approval of this Department is required for any alteration proposed within the above described wetland(s)." The parties were unable to close on the loan by August 31, 1989, the date on which the loan agreement, by its terms, expired. Four months later, on December 15, 1989, DEM reversed itself. In a letter to Graf, DEM announced that "[i]t is the -7- determination of this Department that this [project] can be approved as an INSIGNIFICANT ALTERATION of a freshwater wetland . . . ." Hope was unable to secure alternative financing and lost the Scituate property to foreclosure. STANDARD OF REVIEW STANDARD OF REVIEW __________________ As with all questions of law, this court conducts a de novo review of a district court's entry of summary judgment. Inn ___ Foods, Inc. v. Equitable Co-operative Bank, 45 F.3d 594, 596 (1st ___________ ___________________________ Cir. 1995). Accordingly, an appellate court is not restricted by the district court's rulings of law, but is "free, on appeal, to affirm [the] judgment on any independently sufficient ground." Polyplastics, Inc. v. Transconex, Inc., 827 F.2d 859, 860-61 (1st __________________ ________________ Cir. 1987). See also Massachusetts Mutual Life Ins. Co. v. _________ _____________________________________ Ludwig, 426 U.S. 479, 480-81 (1976). ______ Summary judgment is appropriate when, based upon the pleadings, affidavits, and depositions, "there is no genuine issue as to any material fact, and [where] the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Gaskell v. Harvard Co-op Society, 3 F.3d 495, 497 (1st. Cir. _______ ______________________ 1993). To succeed, "the moving party must show that there is an absence of evidence to support the nonmoving party's position." Rogers v. Fair, 902 F.2d 140, 143 (1st. Cir. 1990). "An issue is ______ ____ only 'genuine' if there is sufficient evidence to permit a reasonable jury to resolve the point in the nonmoving party's favor." NASCO, Inc. v. Public Storage, Inc., 29 F.3d 28, 32 (1st ___________ ____________________ Cir. 1994). -8- DISCUSSION DISCUSSION __________ The FDIC's main argument on appeal is that Hope's failure to fulfill the wetlands conditions of the loan agreement discharged Eastland from any duty to perform. "A condition precedent is an act which must occur before performance by the other party is due." Wood v. Roy Lapidus, Inc. 10 Mass. App. Ct. ____ _________________ 761, 763 n.5 (1980). As Professor Corbin explains, "[c]onditions precedent . . . are those facts and events, occurring subsequently to the making of a valid contract, that must exist ____________ or occur before there is a right to immediate performance, before there is a breach of contract, before the usual judicial remedies are available." 3 A. L. Corbin, Corbin on Contracts 628 (1960) ___________________ (emphasis added). Because of the confusion engendered by the often subtle distinctions between conditions subsequent and conditions precedent, the American Law Institute (ALI) prefers the more catholic term "conditions." See Restatement (Second) of ___ Contracts, Ch. 9, Topic 5, Conditions and Similar Events, at 159 (1981). The ALI defines a condition as "an event, not certain to occur, which must occur, unless its non-occurrence is excused, before performance under a contract becomes due." Id. 224, at __ 160.  Although the FDIC claims that Hope failed to fulfill at least three conditions of the agreement, its focus is on Paragraph 37. Hope argues that Paragraph 37 did not obligate it to obtain prior DEM approval of any wetlands alteration. Hope _____ points out that it fulfilled the first requirement of Paragraph -9- 37 when it provided Eastland with the DEM letter of August 19, 1989, confirming Hope's petition for an Applicability Determination. Hope gamely contends that this same letter fulfilled the second requirement of Paragraph 37, namely that it obtain a determination by DEM that "the subject parcel of land does not require a Permit to Alter Wetlands." The essence of Hope's argument is that the clause cannot mean what it says. Hope argues that it was "inartfully drafted," and that "technically, there is no DEM regulation or applicable law pursuant to which one may obtain a letter from the DEM that a parcel of land does not require a permit to alter wetlands." A more plausible reading of Paragraph 37 is that it reflected Eastland's unwillingness to extend the Scituate loan without the protection of a comfort letter from DEM. Eastland's circumspection in this regard was not unreasonable. Regulatory entanglement can be the deathknell of even the most carefully conceived development, particularly if its backers (as evidenced by their irresolute performance on the Tamarac loan) are in a parlous financial state. Perhaps more significant, the premise of Hope's argument, impossibility, is fatally compromised by DEM's December 15, 1989 letter. While Hope argues that DEM's ultimate change of heart lends credence to its supposition that Eastland seized on DEM'S August demurrer as a pretext for scuttling the agreement, the December DEM letter appears to be precisely the type of assurance that Eastland was looking for, -10- and which Hope contradictorily maintains was impossible to obtain. Hope next argues that the engineer's certificate contemplated by Paragraph 27 sufficiently addressed Eastland's concerns regarding the water connections, including any interim difficulties with DEM. In other words, Hope contends that Paragraph 27 impliedly waived the requirement of prior DEM approval of the alterations, so long as Hope could produce an engineer who would promise that DEM would ultimately relent. Hope also pounces on the fact that Paragraph 37 speaks of wetlands alterations "on" the subject parcel, while the alterations that Hope was to undertake would affect wetlands adjacent to the site. This purported distinction is somewhat beside the point. The clear intent of the disputed Paragraphs, when they are read as a contextual whole rather than as grammatical shards, was to protect Eastland from the eventuality that disapproval by DEM would force the entire project into default. That the construction of the two 3,000 foot pipelines would occur in wetlands adjacent to rather than "on" the site does not alter the fact that DEM opposition to the connectors would impact directly on the project's viability. The fact that Eastland's second draft of the engineer's certificate would have tolerated "an insignificant alteration" of the wetlands on the assurance that it would be ultimately acceptable to DEM makes no difference. It still remained for Hope to produce such a certificate in a timely fashion (it did -11- not). Moreover, the draft did not commit Eastland to accept the certificate of any engineer, particularly one that was bankrupt. ___ Even to the extent that Eastland's second draft certificate could be seen as an offer to compromise the terms of Paragraph 37, the offer was never effectively accepted by Hope. That Eastland chose to withdraw the draft and revert to the more stringent terms of Paragraph 37 is not under the circumstances surprising or the least bit objectionable.3 As a last resort, Hope cites the deposition testimony of two Eastland officers, Lenssen, and his supervisor, Fournier, both of whom participated in the decision to allow the loan commitment to lapse. Lenssen's testimony can be read to suggest that, in his opinion, the lack of DEM approval of the connector project would not ordinarily have been a deal breaker. Fournier testified more or less to the same effect. Hope argues that this evidence is sufficiently material to preclude summary judgment. The opinion of a loan officer that a breach of a particular condition might not in the ordinary course have caused the bank to cancel a loan agreement does not alter the fact that material conditions of this agreement were never fulfilled. Eastland's ____  ____________________ 3 So too with regard to ENDA's default on the cross- collateralized Tamarac loan. Hope argued below that "Eastland waived any ability to rely on any default' of the Tamarac loan . . . [because p]rior to August 1, 1989, Eastland entered into negotiations with ENDA for an extension of the Tamarac loan . . . and Eastland previously had . . . not required ENDA to repay [similar] loans on the due date." That Eastland had been forced to renegotiate payment with Verardo and Ozsezen after three successive defaults supports the inference that the decision to withdraw the Hope loan was primarily motivated by prudential concerns. -12- motives in insisting on the letter of the agreement in refusing to perform are not a matter with which the law is concerned. CONCLUSION CONCLUSION __________ For the foregoing reasons, the judgment of the district court is AFFIRMED. ________ -13-