USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 95-1729 FEDERAL DEPOSIT INSURANCE CORPORATION, AS LIQUIDATING AGENT OF FIRST MUTUAL BANK FOR SAVINGS, Plaintiff, Appellee, v. ELDER CARE SERVICES, INC. and FRANK C. ROMANO, JR., Defendants, Appellants. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Nancy Gertner, U.S. District Judge] ___________________ ____________________ Before Selya, Boudin and Lynch,  Circuit Judges. ______________ ____________________ William T. Harrod III with whom Harrod Law Offices was on briefs _____________________ __________________ for appellants. Daniel H. Kurtenbach, Counsel, with whom Ann S. Duross, Assistant ____________________ _____________ General Counsel, and Richard J. Osterman, Jr., Senior Counsel, were on ________________________ brief for appellee.  ____________________ April 24, 1996 ____________________ BOUDIN, Circuit Judge. In January 1987, Brandon Woods ______________ of Glen Ellyn, Inc., a wholly owned subsidiary of Elder Care, Inc., borrowed $10.1 million from First Mutual Bank for Savings located in Boston. The purpose was to finance the purchase by Brandon Woods of the site of a former seminary in Glen Ellyn, Illinois, and the development of the property into a retirement community. In due course the property was acquired by Brandon Woods for $4.5 million. The bank loan was secured by a mortgage on the seminary property and by two guaranties from third parties in favor of the bank--one from Elder Care, Inc., and the other from its president Frank Romano in his personal capacity. Both guarantees contained broad waiver provisions, including waivers of any requirements of "diligence or promptness" and (to the extent permitted by law) waivers of "any defense of any kind." The guaranties provided that they were governed by Massachusetts law. The loan was to be repaid by January 30, 1988, a date later extended to October 28, 1988, but Brandon Woods defaulted. After a delay to allow Brandon Woods time to refinance (which it failed to do), the bank on June 27, 1989 brought a foreclosure action against Brandon Woods in an Illinois state court. On December 26, 1990, the court entered a foreclosure judgment, fixing the amount then owed at just over $12.8 million, including the unpaid balance, -2- -2- interest and attorney's fees. The court ordered that the property be sold on February 5, 1991. On February 5, 1991, Brandon Woods filed a voluntary bankruptcy petition, blocking the sale of the property under the automatic stay provision of the Bankruptcy Code. 11 U.S.C. 362(a)(1). On April 8, 1991, the bankruptcy court denied the bank's motion to lift the stay, finding that the property if fully developed would be worth about $13 million, just exceeding the amount then claimed by the bank. In August 1991, the bankruptcy court granted a renewed motion to lift the stay after Brandon Woods failed to gain additional financing. On November 23, 1993, after an unexplained two- year delay, the seminary property was sold at a foreclosure sale for $300,000, all of which went to satisfy a construction firm's prior lien. In the meantime, on May 24, 1991, the bank filed the present action in Massachusetts state court against the two guarantors. A month later the bank failed and the Federal Deposit Insurance Corporation ("FDIC") was appointed liquidating agent. The FDIC then removed the case to federal court. In April 1993, the district court granted summary judgment in favor of the FDIC as to liability. In May 1994, the present case was reassigned to a new district judge. On June 8, 1995, the district court granted the FDIC's motion for summary judgment as to damages, and on -3- -3- August 4, awarded the FDIC $15,316,887.33. This represented the then-outstanding balance claimed by the FDIC of $16,416,719.31 (for principal, plus interest and attorney's fees) less specific maintenance expenses incurred by Brandon Woods, claimed by it as an offset, and conceded by the FDIC. The two guarantors now appeal, claiming that there was a material issue of fact precluding summary judgment. In substance, the guarantors say that there is a gross disparity between estimates of the property's value--notably the $13 million estimate made by the bankruptcy court--and the $300,000 sale price obtained at the foreclosure sale. In the guarantors' view, this discrepancy--coupled with the unexplained two-year delay in the sale--gives rise to a factual dispute about whether the FDIC acted in good faith in liquidating the security. Bad faith or fraud, the guarantors argue, would bar or diminish the FDIC's recovery. Massachusetts law does permit a guarantor to waive defenses, see Shawmut Bank, N.A. v. Wayman, 606 N.E.2d 925, ___ ___________________ ______ 927 (Mass. App. Ct. 1993), but probably such a waiver could not immunize bad faith or fraud. See Pemstein v. Stimson, ___ ________ _______ 630 N.E.2d 608, 612 (Mass. App. Ct.), rev. denied, 636 N.E.2d ____ ______ 279 (Mass. 1994). For present purposes, we follow the district court in assuming arguendo that a showing of bad ________ faith or fraud could be used to lessen or prevent recovery; the FDIC asserts the contrary but offers no case directly on -4- -4- point. Still, reviewing the matter de novo, Brown v. Hearst _______ _____ ______ Corp., 54 F.3d 21, 24 (1st Cir. 1995), we agree with the _____ district court that there is no genuine issue of material fact to preclude summary judgment. Determining whether there is a genuine issue ordinarily involves two different dimensions: burden of proof and quantum. The burden of proof on the issue at trial is relevant because, if a party resists summary judgment by pointing to a factual dispute on which it bears the burden at trial, that party must point to evidence affirmatively tending to prove the fact in its favor. Celotex Corp. v. ______________ Catrett, 477 U.S. 317, 322-23 (1986). Here, at trial bad _______ faith or fraud would be an affirmative defense to be proved by the guarantors. See Shawmut, 606 N.E.2d at 928.1 ___ _______ The quantum of proof that the guarantors must offer is a different matter. It is merely "sufficient evidence to permit a reasonable jury to resolve the point in the nonmoving party's favor." Hope Furnace Associates, Inc. v. ______________________________ FDIC, 71 F.3d 39, 42-43 (1st Cir. 1995). In evaluating the ____ sufficiency of this evidence on summary judgment, inferences  ____________________ 1Courts often say that the party seeking summary judgment bears the burden to show that there is no genuine issue of fact. See, e.g., Johnson v. United States Postal ___ ____ _______ ____________________ Serv., 64 F.3d 233, 236 (6th Cir. 1995). This is true enough _____ in general terms, and true specifically as to facts that the moving party would have to prove at trial; but given Celotex, _______ the generalization may be misleading as to facts that the nonmoving party would have to prove at trial as part of its own claim or defense. -5- -5- are drawn in favor of the nonmoving party. Brown, 54 F.3d at _____ 24. Thus, the guarantor's burden is not a heavy one. But it is still their burden to point to admissible evidence that _____ would "permit" a factfinder to conclude rationally that the FDIC had acted fraudulently or in bad faith.  Here, Brandon Woods has offered no reason whatever why the FDIC should have chosen deliberately to undermine the foreclosure sale. The FDIC relied upon that sale to generate immediate proceeds to cover its claim and, on the surface, it had no motive to diminish the recovery from its own security. The prior contractor's lien was only somewhat above the $300,000 realized at the sale. If the property were worth millions more, it was plainly in the FDIC's interest to obtain the highest price--especially since a deliberate failure to seek it could give the guarantors a defense against claims on the guarantees. If the mortgagee in a foreclosure case buys the property itself, it may well have an interest in paying less while preserving its claim for the deficit; but Brandon Woods does not suggest that the winning bidder at the foreclosure was a pawn of the FDIC. Other malign motives could also be imagined but are not suggested here either by the guarantors or the surrounding circumstances. In a negligence case this would not matter but bad faith almost always assumes a motive. It is an uphill effort for the guarantors to urge -6- -6- that, without any apparent motive and contrary to its own best interest, the FDIC chose to sabotage its own foreclosure sale. Nor is there any indication of how, in the guarantors' view, this sabotage was carried out. An affidavit of the FDIC describes the notice given for the auction and the bidding process. Notice was given in a number of journals (e.g., The Chicago Tribune, Crain's Chicago Business, Glen ____ ____________________ _________________________ ____ Ellyn News), and it appears that marketing efforts by a ___________ professional were made in addition to the notices. Allegedly, 20 potential bidders appeared. In the event, three persons bid. The state court thereafter confirmed the sale, finding that the sale was properly conducted. Normally, a party suggesting fraud or bad faith is expected to point to the misconduct (lies, rigged account __________ books, self-dealing by a fiduciary) that reflects the bad faith or constitutes the fraud. Cf. Fed. R. Civ. P. 9(b). ___ True, on some occasions the inference of fraud or bad faith might be compelled by the combination of motive and outcome; but here motive is utterly lacking and the outcome far more ambiguous than the guarantors suggest. In all events, the failure to allege any specific misconduct consonant with fraud or bad faith further impairs the guarantors' claim. Against this background, Brandon Woods points to two circumstances: the supposed discrepancy in amounts between -7- -7- estimates of value and the price received, and the admitted delay in the sale. The most striking difference in amounts is between the $13 million suggested by the bankruptcy court and the $300,000 winning bid two years later. Massachusetts courts have held what common sense would in any event suggest: that the disparity between appraised value and amount received in foreclosure does not generally show bad faith but might do so in extreme circumstances. Seppala & _________ Aho Constr. Co. v. Petersen, 367 N.E.2d 613, 620 (Mass. ________________ ________ 1977); see also RTC v. Carr, 13 F.3d 425, 430 (1st Cir. _________ ___ ____ 1993).  In this instance, however, the $13 million figure was not a serious estimate of the property's then-current value. As the transcript of the bankruptcy hearing shows, it was simply an attempt to approximate what the retirement- community project would be worth if it were ever built and all of its units sold at a projected price. Finding that this amount would (slightly) exceed the debt then owed to the bank, the bankruptcy court offered a few months' delay in the foreclosure for Brandon Woods to seek more financing. There was no finding that completion of the project or the sale of the units was likely. It is true that in the same bankruptcy proceeding, a bank expert apparently testified that the property was then worth just under $7.5 million. But it appears that the -8- -8- bank's interest at the time was simply to show that the property was worth less than the $12 millon or so then claimed by the bank, and thereby to justify an immediate sale. Nor do we know whether the bank was valuing the property at a supposed market value rather than at the lower price their forced liquidation would ordinarily be expected to bring. See BFP v. RTC, 114 S. Ct. 1757, 1761-62 (1994). ___ ___ ___ Not only is the $7.5 million figure largely unexplained, but it is also undermined as a liquidation value by Romano's own admission. Romano himself warned the FDIC only a few months later, in September 1991, that the property might bring only $2 million on liquidation. And when the property was sold two years later for $300,000, it was burdened with $1.1 million in back taxes and the cost of dealing with certain environmental hazards, including asbestos. Adjusting the purchase price for these burdens assumed by the purchaser, the discrepancy between Romano's $2 million figure and the sale price hardly seems large. Brandon Woods also points to the delay of two years in carrying out the sale, which is as close as it ever gets to identifying a deficiency in the FDIC's conduct. Brandon Woods makes no effort to show that the delay caused a substantial reduction in the price ultimately obtained, but the district court said that property values did decline during the delay. In any event, the FDIC had itself urged an -9- -9- immediate sale; such a sale would have avoided upkeep and taxes on the property (which may have been earning no income); and the FDIC is oddly silent about the reasons for the delay. The facts just described might be an ample basis for an inference that the FDIC acted negligently in failing to dispose more promptly of the property. The impression that the FDIC lost track of the matter is reinforced by the fact that, after failing to act for two years, the FDIC was spurred to make the sale by news that the property was about to be sold for unpaid taxes.2 If this were a case about negligence, it might well be one in which summary judgment could not be granted for the FDIC. But the broad waiver provision in the guaranties forecloses such defenses against the bank or its successor in interest. Brandon Woods does not question this reading nor claim that Massachusetts law forbids such a waiver. So while negligence may be a plausible inference (and could also explain the FDIC's reticence), it is no defense to summary judgment in these circumstances. If anything, the likelihood of negligence tends further to undermine the claim that bad  ____________________ 2At oral argument counsel suggested that the explanation for the delay may be found in efforts of the parties to reach a "global settlement" involving other Romano-controlled property in Massachusetts. But in determining whether summary judgment was properly granted, we must take the record as it existed in the district court. -10- -10- faith or fraud could be inferred as the explanation for the delay. In all events, there was inadequate evidence of fraud or bad faith to raise a genuine issue of material fact. It is unnecessary to consider the issue to which the parties devote much of their briefs, namely, whether the guarantors were entitled to litigate about the fairness of the sale price at all. The FDIC argues that the guarantors are precluded from doing so because of the state court ruling that the sale was fair; the guarantors say that they were not ____ parties to that proceeding even though Brandon Woods itself was a party. We express no view on the collateral estoppel issue since it does not affect the outcome. Affirmed. ________ -11- -11-