# United States Court of Appeals

## For the First Circuit

No. 00-2072

LIBERTY MUTUAL INSURANCE COMPANY,

Plaintiff, Appellee,

v.

METROPOLITAN LIFE INSURANCE COMPANY,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Robert E. Keeton, <u>U.S. District Judge</u>]

Before

Boudin, <u>Chief Judge</u>,

Bownes, <u>Senior Circuit Judge</u>,

and Torruella, <u>Circuit Judge</u>.

        <u>Alan L. Briggs</u> with whom <u>James P. Wehner</u>, <u>Amy L. Easton</u>, <u>Squire, Sanders & Dempsey L.L.P.</u>, <u>George W. Walker, III</u>, <u>Lee H. Copeland</u> and <u>Copeland, Franco, Screws & Gill, P.A.</u> were on brief for appellant.
        <u>Mariann Zampano Malay</u>, <u>Dwight D. Valentine</u>, <u>Niarchos, Sullivan, Valentine & Malay</u>, <u>Walter Andrews</u>, <u>Lon Berk</u>, <u>Paul Janaskie</u>, <u>Lara Ramsey</u> and <u>Shaw Pittman</u> on brief for St. Paul Surplus Lines Insurance Company, Amicus Curiae.
        <u>Erik Lund</u>, <u>Vincent M. Amoroso</u> and <u>Posternak, Blankstein & Lund, LLP</u> on brief for First State Insurance Company, Amicus Curiae.
        <u>James E. Harvey, Jr.</u> with whom <u>Kevin D. McElaney</u>, <u>John F. Brosnan</u> and <u>O'Malley and Harvey, LLP</u> were on brief for appellee.

August 15, 2001

BOUDIN, <u>Chief Judge</u>.   This appeal grows out of a lengthy and complex dispute over commercial liability insurance coverage.  At odds are the insured, Metropolitan Life Insurance Co. ("MetLife")[1] and one of its insurers, Liberty Mutual Insurance Co. ("Liberty").  MetLife claims that Liberty had a duty to defend and indemnify MetLife in numerous lawsuits relating to the marketing of life insurance policies and real estate investments.  Liberty refused  coverage and prevailed in the district court.  MetLife now appeals.

## I. BACKGROUND

The origins of this dispute lie in twenty-seven lawsuits brought against MetLife by dissatisfied customers.  The lawsuits fall into three groups:

- Sixteen individual "vanishing premium" lawsuits in Alabama state courts (the "Alabama cases");

- Nine nationwide "vanishing premium" class actions in federal court (the "class actions"); and

- Two real estate investment cases arising out of dealings with Copley Real Estate Advisors, a MetLife subsidiary (the "real estate cases").

---

[1]MetLife is the successor corporation to the original insured, New England Mutual Insurance Co.  MetLife merged with New England Mutual in 1996 and, for simplicity's sake, this decision refers throughout to MetLife.

-2-

MetLife claims that the Commercial (previously "Comprehensive") General Liability Insurance ("CGL") and Umbrella Excess Liability Insurance ("UEL") policies that it purchased from Liberty require that Liberty defend and indemnify MetLife. We describe each group of lawsuits in turn.

The Alabama Cases. From late 1994 through 1996, sixteen individuals filed suit against MetLife in Alabama state courts claiming that MetLife sales representatives had negligently or intentionally made misrepresentations concerning MetLife's life insurance policies. In particular, the lawsuits charged that representatives had told buyers that if they reinvested their yearly life insurance dividends, their obligation to pay premiums would "vanish" after eight to ten years. In fact, the buyers' payment obligations continued. The Alabama plaintiffs claimed that as a result of MetLife's actions they suffered monetary damages and mental anguish.

Beginning in December 1994, MetLife began tendering the Alabama cases to Liberty. Based on the plaintiffs' "mental anguish" claims, MetLife argued that Liberty had a duty to defend and indemnify MetLife because its CGL policy included coverage for "personal injury" claims. Initially, Liberty agreed to defend the claims, but eventually it concluded that

-3-

the policies did not afford any coverage and notified MetLife that it would neither defend nor indemnify.

In the litigation with the Alabama plaintiffs, MetLife eventually paid legal fees of approximately $450,000 and settled 15 of the 16 suits for roughly $2.7 million. The last suit was still pending when the present federal action was heard. MetLife seeks to hold Liberty liable for both the defense costs and the settlement payments.

The Class Actions. The second group of suits also arose from customer complaints about vanishing premiums. Beginning in October 1995, class actions were filed in various federal and state courts against MetLife; all recited claims that were similar to those in the Alabama cases. The federal class actions were consolidated in the federal district court in Massachusetts. The consolidated complaint alleged inter alia that MetLife's misdescription of the vanishing premium concept comprised "unfair competition," violating the Massachusetts Consumer Protection Act, Mass. Gen. Laws ch. 93A, §§ 2, 9 (2000).

MetLife tendered the class action cases to Liberty on the ground that the CGL policy provided coverage for claims of unfair competition arising out of advertising. The advertising to which MetLife pointed were the computer-generated

-4-

illustrations it used during the vanishing premium sales meetings with customers. Liberty declined to defend the class actions or indemnify MetLife. MetLife spent more than $4 million in legal fees to defend the suits. Subsequent to its decision in this case, the district court approved a $155 million settlement for the class actions.

The Real Estate Cases. The final group of lawsuits stemmed from MetLife's sale of commercial real estate interests to two state pension fund boards. In 1987, Copley Real Estate Advisors, a MetLife subsidiary, sold $450 million worth of commercial real estate to the Washington State Investment Board (the "Washington board") and $50 million worth of real estate to the Ohio State Teachers Retirement Board (the "Ohio board"). Washington also bought other real estate interests controlled by MetLife--one set of investments between 1984 and 1990 for about $185 million and another set between 1986 and 1988 for about $65 million.

As national real estate markets declined in the late 1980s, the investments quickly lost much of their value. In 1993, Washington and Ohio sued MetLife in state court suits alleging numerous wrongs; one set of claims was that MetLife had misrepresented the risks, fees, and other material aspects of the investments. In June 1995, MetLife notified Liberty of the

Washington and Ohio lawsuits. Because the false statements complained of by the Washington and Ohio boards appeared in MetLife's written promotional material, MetLife said that the suits were covered by both the CGL and UEL policies' advertising injury clauses.

Liberty concluded that it would not defend or indemnify MetLife as to any of these real estate suits; it said that the promotional materials were not advertising and, further, that coverage was excluded under the policies' "insurance and related operations exclusion" ("IROE"). MetLife subsequently incurred nearly $7.75 million in legal expenses in the two suits and settled both actions; the Washington claim settled for almost $120 million. The record does not indicate the amount of the Ohio settlement.

The Policies. MetLife purchased eleven separate CGL policies (1985-96) and three separate UEL policies (1986-89); each policy covered a single year. The UEL policies provide higher liability limits. The coverage provisions are, so far as pertinent here, the same except where otherwise indicated. The key policy provisions in dispute are included in an appendix to this opinion.

The UEL and CGL policies provided coverage, subject to exclusions, for several broad categories of liability. As

already noted, the liabilities for which MetLife sought coverage stemmed from MetLife's alleged misrepresentations in selling vanishing premium insurance to consumers and its alleged misrepresentations in the sale of real estate interests to the Washington and Ohio boards. To establish coverage, MetLife mainly relied on provisions covering so-called "advertising injury," a phrase defined slightly differently in the CGL and UEL policies. Further, in the Alabama cases, MetLife also relied on a coverage provision for "personal injury," which was contained in the CGL policies, but not the UEL policies.

In addition to disputing initial coverage, the main exclusion invoked by Liberty was the multi-part IROE exclusion from both personal injury and advertising liability, captioned "insurance and related operations." The IROE, which was present in the CGL policies between 1985 and 1988 and all of the UEL policies, contains two paragraphs pertinent here: one excluding claims concerning insurance or annuities, and another excluding injury or liability resulting from professional services in effecting insurance, the conduct of an investment or acting as a fiduciary for pension or welfare funds.

The District Court Proceedings. In June 1997, after Liberty had refused to defend or indemnify in all three sets of suits against MetLife, MetLife brought a state-court declaratory

judgment action against Liberty in Alabama seeking defense and indemnification for the twenty-seven lawsuits. Liberty countered by filing its own declaratory judgment action in the federal district court in Massachusetts, asserting that it had no duty to defend or indemnify MetLife. After the district court denied MetLife's motion to dismiss or stay the federal action in deference to MetLife's Alabama action, MetLife filed a counterclaim in federal court to establish coverage in all three groups of suits.

Over the next two years, the district court supervised extensive discovery, heard numerous motions, and conducted a lengthy trial. Although the trial began with MetLife ready to try its claims as to all three sets of lawsuits, in the end the claims submitted to the jury were greatly narrowed by two sets of rulings by the district court during trial--rulings that give rise to two of the three main issues pressed by MetLife on this appeal.

For the class action cases, MetLife asserted coverage on the ground that the misrepresentations charged in those cases fell within the advertising injury coverage of the Liberty policies. Its theory of coverage under the CGL policies relied on the fact that the master complaint in the consolidated Massachusetts class action against MetLife included a cause of

action for unfair competition under chapter 93A, and the CGL policies included "unfair competition" within the definition of "advertising injury."[2]

In a motion for summary judgment, Liberty asserted that the CGL policy only covered claims of unfair competition when they involved injury to an insured's competitors, and it invoked Massachusetts case law interpreting similar insurance clauses. The district court denied Liberty's motion for a variety of reasons, but its decision did not squarely address the merits of Liberty's claim regarding unfair competition. Liberty Mut. Ins. Co. v. Metro. Life Ins. Co., 53 F. Supp. 2d 529, 533-34 (D. Mass. 1999). Liberty also failed in other efforts to forestall trial on coverage for the class action suits.

On January 24, 2000, the first day of trial, Liberty renewed its argument in a motion in limine to preclude MetLife from claiming any coverage for, or presenting any evidence relating to, the unfair competition claim arising from the class action suits. To MetLife's surprise, the district court provisionally agreed with Liberty and prohibited MetLife from

_____

[2]The UEL policies did not include "unfair competition" as a form of advertising injury, but included in the definition other language not appearing in the CGL, namely, coverage for any "negligent act, error or omission in the use of advertising or merchandising ideas." As to the UEL policies, MetLife relied on this latter language to establish coverage.

making any mention of unfair competition coverage in its opening argument. MetLife was never able to persuade the court to alter its position, so no evidence relating to unfair competition coverage was presented at trial.

The district court's other contested ruling, which cut even deeper, concerned MetLife's failure to allocate its damages in a manner satisfactory to the district court. The issue first arose when MetLife made a proffer of testimony of its in-house counsel, Robert Jordan. In cross examining Jordan, Liberty elicited the fact that some of the damages presented by MetLife might be attributed to defense and settlement costs paid by MetLife on behalf of its independent sales agents, who were not covered by Liberty's insurance. The court expressed concern that MetLife did not intend to allocate its damages between these uninsured agents and the insured principal or between covered and uncovered claims.

On the fifth day of the trial, the district judge returned to this issue when he discussed the parties' proposed jury instructions. The district judge advised the parties that:

> [I]f MetLife is only able to establish that there is a policy coverage for a small minority of the total of the claims within a particular lawsuit, the idea that that triggers a duty to defend the whole lawsuit at Liberty Mutual's expense entirely and also a duty to bear the costs of

-10-

settlement is, I think, going to be out of bounds.

Because MetLife had not yet attempted to present its damages evidence, the district court did not rule on whether and how MetLife would have to allocate its damages.

On two occasions thereafter, the district court prohibited MetLife from presenting evidence of damages. On the first occasion, the district court disallowed evidence of defense costs in the real estate cases on the ground that it did not properly allocate costs between the Washington and Ohio lawsuits and between covered and uncovered claims within the Washington case; it also disallowed evidence of the Washington settlement on the ground that the settlement figure did not allocate between covered and uncovered claims. On the second occasion, the district court did not allow evidence of MetLife's legal bills for the Alabama cases and the class actions on the ground that the bills were not relevant until they were established as necessary by an expert witness.

At the close of all evidence the district court suggested that MetLife might reopen its case for the purpose of presenting damages evidence that allocated defense and settlement costs between covered and not covered matters. However, when MetLife continued to proffer damages evidence in

unallocated form, the district court ultimately refused to allow MetLife to reopen the damages issue. As a result of the district court's preclusion of damages evidence, none of the damage claims as to any of the three sets of lawsuits were submitted to the jury.

In the end, because of the district court's rulings, the jury was asked to determine only whether Liberty had a future duty to defend or indemnify a single Alabama lawsuit (Loudermilch) that had not yet been resolved and whether it had a future duty to defend or indemnify the still pending class action lawsuits under the UEL policy (but not under the CGL policy, since the court had already rejected coverage based on its reading of the unfair competition language). None of the claims based on the real estate cases were submitted to the jury because MetLife conceded that it had not made out its prima facie case since its damages evidence had been excluded.

After deliberating for several days, the jury found that Liberty did not have a duty to defend or indemnify MetLife on any of the claims submitted to the jury regarding Loudermilch or the class action cases. In doing so, the jury answered 133 special questions that detailed its reasoning. The jury found inter alia that the Loudermilch case was not covered by the CGL policy's "personal injury" clause, that the class actions were

-12-

not covered by the UEL policy's "advertising injury" clause, and that numerous exclusions barred MetLife from recovering defense or settlement costs for both sets of lawsuits.

On April 12, 2000, the district court issued a judgment in favor of Liberty on all counts, including those that had not been submitted to the jury. In an accompanying unreported opinion, the court explained why certain questions had not been submitted to the jury and why it had ruled against MetLife on those issues. In particular, the court further explicated its ruling on the class action lawsuits' unfair competition claim, the need to allocate damages, and the general scope of Liberty's duty to defend.

## II. DISCUSSION

MetLife now appeals and makes three claims of error: that the district court incorrectly placed the burden of allocating defense and indemnity costs between covered and non-covered matters on the insured, thus effectively preventing MetLife from presenting its damages evidence; that the district court erred by not permitting MetLife to seek coverage for the class actions' unfair competition claims; and that the district court erroneously instructed the jury as to how it should interpret exclusionary clauses in the insurance policies.

We address MetLife's arguments in turn, applying <u>de novo</u> review to questions of law. <u>Speen</u> v. <u>Crown Clothing Corp.</u>, 102 F.3d 625, 628 (1st Cir. 1996), <u>cert. denied</u>, 520 U.S. 1276 (1997). Included in this category is the interpretation of the insurance policies where relevant facts are not in dispute. <u>U.S. Liab. Ins. Co.</u> v. <u>Bourbeau</u>, 49 F.3d 786, 787 (1st Cir. 1995). The parties agree that this diversity action is governed by the substantive law of Massachusetts.

<u>The Alabama Cases</u>. Two of MetLife's three claimed errors are implicated in the Alabama cases: the exclusion of damages evidence because of the district court's ruling on allocation and the district court's jury instruction on interpreting exclusionary clauses. Yet the jury's special verdict specifically rejected <u>coverage</u> for the single Alabama lawsuit that it did consider (<u>Loudermilch</u>). There is no reason to think that the result would have been any different if claims based on the other fifteen Alabama lawsuits had been submitted to the jury.

The <u>Loudermilch</u> case was decided by the jury because, unlike the other fifteen Alabama lawsuits, the exclusion of MetLife's damages evidence did not undermine MetLife's claim that Liberty had a continuing duty to defend and indemnify. Thus, the jury was asked:

With respect to the duty to defend, was any of the claims that a policyholder made against MetLife in any of the lawsuits that various policyholders brought against MetLife a claim within the scope of a liability insurance coverage as defined in the coverage provisions of any of the various policies in evidence that Liberty Mutual issued to MetLife (or New England)?

To this, the jury answered "no," thus rejecting any coverage for the Loudermilch lawsuit independent of the exclusionary clauses. Because the duty to defend is broader than the duty to indemnify, Ruggerio Ambulance Serv., Inc. v. Nat'l Grange Mut. Ins. Co., 724 N.E.2d 295, 298 (Mass. 2000), the jury's finding also negates a duty to indemnify. Bagley v. Monticello Ins. Co., 720 N.E.2d 813, 817 (Mass. 1999).

The Loudermilch jury verdict against MetLife makes MetLife's claimed errors harmless. See Brandt v. Wand Partners, 242 F.3d 6, 16-17 (1st Cir. 2001); Fite v. Digital Equip. Corp., 232 F.3d 3, 6 (1st Cir. 2000). As MetLife conceded in its proposed jury instructions, all of the Alabama suits involved "substantially similar claims." A review of the sixteen complaints confirms this: many are identical and all charge MetLife with the same improper conduct and rely on the same legal theories for recovery. And, since Loudermilch failed inter alia for lack of initial coverage, the result is

-15-

unaffected by any alleged error in instructing the jury as to exclusions.

In its reply brief, MetLife argues that Liberty has failed to show that the Alabama cases "are so similar that some form of estoppel should apply." Its sole support for this position is to say: "Indeed, they are not." In any event, estoppel is not the issue; the question is whether there is any reason to believe that the claims as to the fifteen lawsuits would have been resolved differently than the sixteenth lawsuit. Fed. R. Civ. P. 61; Fed. R. Evid. 103; Nieves-Villanueva v. Soto-Rivera, 133 F.3d 92, 102 (1st Cir. 1997). We have been given no reason to think that they would.

The Class Actions. In the case of the class action lawsuits, two of MetLife's three claims of error are relevant: the district court's decision not to allow MetLife to invoke unfair competition and the jury instruction on interpreting exclusionary clauses. However, as with the Alabama lawsuits, the jury verdict saves us from juxtaposing state unfair competition law with policy coverage because any supposed error made by the district court was (once again) harmless.

Although the district court prohibited MetLife from arguing that the class action lawsuits were covered by the CGL policy's advertising injury clause, it permitted MetLife to

claim coverage under the same clause in the UEL policy because, as already noted (see note 2, above), the two policies included different definitions of advertising injury. One of the questions the jury was asked was whether:

> the use of [MetLife] illustrations by sales agents of [MetLife], as alleged in the underlying class action complaints, constitute[d] advertising as used in the 1986-1989 [UEL] policies.

To this, the jury answered "no."

Where there is no advertising there can be no advertising injury. The policy language expressly requires that an injury arise from the "insured's advertising activities." MetLife conceded as much when it said in its proposed jury instructions that the first element of advertising injury under both the CGL and UEL policies was the existence of "an advertising activity" "committed by" MetLife. See also N.H. Ins. Co. v. R.L. Chaides Constr. Co., Inc., 847 F. Supp. 1452, 1455 (N.D. Cal. 1994).

The problem for MetLife is that the jury's conclusion-- that the illustrations used by MetLife's agents were not "advertising" under the UEL policies--applies with equal force to MetLife's claim for coverage under the CGL policies. Although the CGL claim did not go to the jury, the illustrations in question are the same as those in the UEL claim. The only

difference between the two claims was the type of wrong alleged to have been caused by the illustrations; under the CGL the wrong was unfair competition, whereas under the UEL it was a "negligent act, error or omission."

Thus, even if we assume that the district court misread Massachusetts unfair competition law and mistakenly precluded MetLife's claim for coverage under the CGL policy, that error was harmless because there is no practical likelihood that the CGL claim could have succeeded when the UEL claim failed. Brandt, 242 F.3d at 16-17. The jury's verdict shows that MetLife's CGL claim would not have satisfied the first element of advertising coverage, and this failure would have doomed MetLife's claim without regard to exclusions.

The Washington and Ohio Lawsuits. As to the insurance claims based on the Washington and Ohio lawsuits, the district court directed a verdict for Liberty after concluding that the damages evidence offered by MetLife failed to allocate amounts between covered and non-covered claims. MetLife says the district court got the rules on allocation exactly backward and that its evidence on damages should have been admitted and the claims submitted to the jury. Liberty defends the district court's allocation ruling and says that, in any case, none of the claims are covered under the policy.

-18-

It is not uncommon for a lawsuit against an insured to assert some claims that are covered by the insurance policy and others that are not. In Massachusetts, as elsewhere, an insurer must defend the entire lawsuit if it has a duty to defend any of the underlying counts in the complaint. Mt. Airy Ins. Co. v. Greenbaum, 127 F.3d 15, 19 (1st Cir. 1997) (citing Aetna Cas. & Sur. Co. v. Cont'l Cas. Co., 604 N.E.2d 30, 32 n.1 (Mass. 1992)). And the general rule under Massachusetts law is that if the insurer fails to defend the lawsuit, it is liable for all defense costs and (assuming policy coverage) the entire resulting judgment or settlement, unless liability can be allocated among covered and uncovered claims. Liquor Liab. Joint Underwriting Ass'n of Mass. v. Hermitage Ins. Co., 644 N.E.2d 964, 968-69 (Mass. 1995); Palermo v. Fireman's Fund Ins. Co., 676 N.E.2d 1158, 1163-64 (Mass. App. Ct. 1997).

Massachusetts courts have not expressly decided which party bears the burden of allocating defense costs, but when allocation of defense costs is possible, the burden of allocation generally falls on the insurer. This is certainly the rule as to allocation of indemnity costs, Liquor Liab. Joint Underwriting Ass'n, 644 N.E.2d at 969; Palermo, 676 N.E.2d at 1163, and this approach likely applies to defense costs, since the insurer should have been in a position to properly allocate

-19-

both types of costs had it defended the lawsuit. <u>See</u> <u>Aerojet-Gen. Corp.</u> v. <u>Transp. Indem. Co.</u>, 948 P.2d 909, 928 (Cal. 1998); Windt, <u>Insurance Claims & Disputes</u> § 4.13 at 204 (3d ed. 1995).

The district court may not have been wrong in thinking that there must be limits to this general approach. Here, for example, the district court thought some of the claimed expenses relating to the vanishing premium suits were to defend independent agents who were not insured and others were for sales outside the period covered by Liberty's policy. Possibly an insured who needlessly conflates expenses not covered by the policy with expenses that arguably are covered would forfeit any claim that the insurer should bear the burden of disaggregating the asserted damage figures.

However, so far as we can tell, the gravamen of the district court's misallocation objection <u>in the real estate suits</u> was that some of the expenses incurred in defending claims by Washington were going to benefit MetLife's future defense of the Ohio suit. It is hard to view such a collateral benefit as a misallocation: so long as those costs were necessary for covered claims in the Washington suit, the fact that the research and discovery might be useful in some later case would hardly defeat full recovery.

The district court was apparently also concerned that many of the complaint's theories of recovery in the Washington suit could not conceivably come within the advertising coverage of the UEL policy. However, where the theories relate to a common core of facts, defense costs are often hard to separate between theories--the witnesses and documents are often the same--and this is ordinarily the classic case for imposing the allocation burden on the insurer who refused to defend a covered theory. See, e.g., Home Ins. Co. v. St. Paul Fire & Marine Ins. Co., 229 F.3d 56, 65-66 (1st Cir. 2000).

However, any mistake by the district court on this allocation issue is irrelevant unless some real estate claim against MetLife was arguably covered by a Liberty policy--an issue to which we now turn. An insurer has a duty to defend its insured "if the allegations in the third-party complaint are reasonably susceptible of an interpretation that they state or adumbrate a claim covered by the policy terms." Mt. Airy Ins. Co., 127 F.3d at 18-19 (quoting Sterilite Corp. v. Cont'l Cas. Co., 458 N.E.2d 338, 340 (Mass. App. Ct. 1983)). Here, Liberty has two separate arguments against coverage.

The first argument is that the real estate suits do not even arguably involve "advertising activities" within the meaning of the coverage provisions of the policies, an issue on

-21-

which MetLife bears the burden.  <u>Hakim</u> v. <u>Mass. Insurers'</u> <u>Insolvency Fund</u>, 675 N.E.2d 1161, 1166 n.13 (Mass. 1997).  The CGL and UEL definitions of advertising injury contain slightly different language; but in both cases, Liberty says that the promotional materials given to the Washington and Ohio boards, essentially prospectuses describing the multi-million-dollar real estate packages, are not "advertising" in any common sense of the term.

There is a basic split in authority on this issue. Some courts have taken the term "advertising" in its ordinary usage to suggest public dissemination, usually to a wide audience; on this view, a prospectus tailored to one customer and one transaction, setting forth the terms of the proposed deal and its supposed advantages, is not advertising but part of the negotiation.  Other courts have said that advertising can occur in individual transactions, at least where the customer base is small or where this is the customary practice in the industry.  <u>Peerless Lighting Corp.</u> v. <u>Am. Motorists Ins. Co.</u>, 82 Cal. App. 4th 995, 1008-09 (Cal. Ct. App. 2000) (collecting cases).

In Massachusetts there is only one leading case on point and it very much adopts the former view.  <u>Smartfoods, Inc.</u> v. <u>Northbrook Property & Casualty Co.</u>, 618 N.E.2d 1365 (Mass.

App. Ct. 1993), concerned a letter from one company to another proposing terms for the latter to act as distributor of products for the former; when litigation arose between the two companies, the insured producer relied inter alia on an advertising injury clause similar to the CGL policy in this case. The Appeals Court said that "advertising means a public announcement to proclaim the qualities of a product or point of view" and that advertising's objective is the "[w]ide dissemination" of information about a product. Id. at 1368. It deemed the letter so unrelated to "advertising" as to defeat even a duty to defend. Id. at 1369.

MetLife counters that this case is distinguishable on its facts, because in the present real estate cases there were "brochures and a marketing program directed at multiple institutional investors." Yet aside from Smartfoods's broad language, Smartfoods is fairly close on its facts: apparently the producer sent similar letters to six other distributors. Furthermore, MetLife concedes that it had a continuing relationship with the two state boards, making a proposal for a particular transaction even less like advertising and more like continuing business.

MetLife also asserts that its UEL policy is broader in defining advertising injury that the CGL language used both in

the Liberty policy and the Smartfoods case.  It is true that the latter two do not extend protection to claims for "any negligent act, error or omission in the use of advertising or merchandising ideas"; but the UEL policy, like the CGL and Smartfoods policies, has a prior condition, namely, that the act, error or omission grow out of "advertising activities." The former is a pre-condition of any coverage under this part of the policy and, if Smartfoods is followed, then this condition has not been met.

Absent a decision by the state's highest court, we are free to make our own best guess as to Massachusetts law, Michelin Tires (Canada) Ltd. v. First Nat'l Bank of Boston, 666 F.2d 673, 682 (1st Cir. 1981), but there is no reason not to consider Smartfoods as the prevailing rule in Massachusetts: it is reasonably recent; it is not inconsistent with SJC precedent; and it accords with what appears to be the majority view, albeit by a small margin, among the courts that have spoken on the issue, Peerless Lighting Corp., 82 Cal. App. 4th at 1008-09; 2 Windt, Insurance Claims & Disputes, § 11.29 at 339 n.404 (3d ed. 1995).

Smartfoods was decided before the Washington and Ohio cases were tendered to Liberty.  Nothing in the complaints identified advertising at all; indeed, MetLife tendered the

-24-

cases only after it ascertained that the prospectuses would be part of the boards' evidence.  But by this time <u>Smartfoods</u> had made clear that under Massachusetts law, such a tailored document setting out a proposal for an individual customer is not "advertising activity" or even arguably so.  MetLife's claim for coverage of the Washington and Ohio lawsuits thus fails because there was no "advertising injury."

Even if there was advertising activity and injury, we think that MetLife's claim would still fail because of the exclusions of the IROE.  The IROE was in all three of MetLife's UEL policies, which are the pertinent policies for the real estate cases.[3]  The critical language appears in subparagraphs (c)(1), (5), and (6) of the IROE, which exclude coverage for advertising liability where such liability "arise[s] out of the rendering or failure to render professional services in" the following activities:

> (1) advising, inspecting, reporting or making recommendations in the Insured's capacity as an insurance company, consultant, broker, agent or representative thereof, or
>
> . . .
>
> (5) the conduct of an investment, loan or operation, or

[3]On the first day of trial, MetLife conceded that the CGL policy's unfair competition provision applied only to the vanishing premium class actions and not to the real estate cases.  Moreover, MetLife's briefs--both at trial and on appeal--focus only on coverage under the UEL policy.

-25-

(6) any capacity as a fiduciary or trustee for mutual funds, pension or welfare funds or other similar activities. . . .[4]

The Washington and Ohio complaints alleged that MetLife, as the parties' investment adviser and manager, assumed fiduciary duties to the pension funds and that MetLife breached its fiduciary duties by misrepresenting and failing to disclose aspects of the real estate transactions and by mismanaging the board's investment portfolio.  It seems to us that on their face, such claims fall directly within the language of "advising" and "conduct[ing]" investment activities under subparagraphs (c)(1) and (5) and acting in "any capacity" as a fiduciary for pension or welfare funds under subparagraph (c)(6).[5]

Neither of MetLife's two counter-arguments to this initial conclusion is persuasive.  It first says that the common condition for the exclusion--that liability arise out of

---

[4]Liberty also relies upon paragraph (a) of the IROE excluding advertising liability that relates to an annuity; but while the principal transaction involved an annuity in certain respects, the record does not adequately reveal just what role it played, and we do not rely upon paragraph (a).

[5]In Massachusetts, the term "arising out of" has been interpreted to require merely that a claim be connected to an excluded event.  See Med. Records Assocs., Inc. v. Am. Empire Surplus Lines Ins. Co., 142 F.3d 512, 516 n.4 (1st Cir. 1998) (citing New England Mut. Life Ins. Co. v. Liberty Mut. Ins. Co., 667 N.E.2d 295, 198 (Mass. App. Ct. 1996)).

"professional services"--is not satisfied, because professional services encompasses not mere business operations but activities involving "the need for specialized learning or training."  The latter is a supportable view, e.g., Roe v. Fed. Ins. Co., 587 N.E.2d 214, 217 (Mass. 1992), but it hardly excludes assistance and advice provided by a professional financial firm in assessing and purchasing a huge real estate portfolio.

The other response offered by MetLife to subparagraphs (c)(1), (5), and (6) is that the exclusion, where it applies, only defeats the duty to indemnify and not the duty to defend. MetLife notes that the introduction to the IROE states that "[t]his policy does not apply to . . . Advertising Liability"; and it suggests that "advertising liability" refers not to all damages incurred because of "advertising injury" but only to the liability to the plaintiffs who sue the insured and then collect a judgment or settlement.  In other words, by using the term "liability," MetLife says that Liberty made the entire exclusion inapplicable to defense costs.

The duty to defend, in both the CGL and UEL policies, is derivative; it requires that the claim of the plaintiff in the underlying suit--whether valid or not--seek damages for some injury that is arguably covered by the policy.  See Higgenbottom v. Aetna Cas. & Sur. Co., 425 N.E.2d 370, 372 (Mass. App. Ct.

-27-

1981); Windt, Insurance Claims & Disputes § 4.01 at 149-50 (3d ed. 1995). If such a suit seeks on its face to impose a liability excluded from coverage by the IROE, then the liability is not insured against and there is not even an arguable obligation to defend. Terrio v. McDonough, 450 N.E.2d 190, 194 (Mass. App. Ct. 1983).[6]

As matters stand, we think that Liberty had no duty to defend or indemnify MetLife in the real estate suits because the cases are not within the advertising injury coverage and, even if they were, would be independently excluded by the IROE. Either ground is sufficient for affirmance. Hope Furnace Assocs., Inc. v. FDIC, 71 F.3d 39, 42 (1st Cir. 1995). Given the stakes, we have considered MetLife's arguments with great care, but in the end, find no basis for reversal or remand.

For the reasons stated, the judgment of the district court is affirmed.

APPENDIX

I. Coverage Clauses

Advertising Injury Coverage Under the 1985-91 CGL Policies:

---

[6]The single case that MetLife cites in support of its argument, United States v. U.S. Fid. & Guar. Co., 601 F.2d 1136 (10th Cir. 1979), is readily distinguishable on its facts. See Jesko v. Am.-First Title & Trust Co., 603 F.2d 815, 817 & n.2 (10th Cir. 1979).

The company will pay . . . all sums which the insured shall become legally obligated to pay as damages because of . . . advertising injury to which this insurance applies, sustained by any person . . . and arising out of the conduct of the named insured's business, . . . and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such injury, even if any of the allegations of the suit are groundless, false or fraudulent. . . . [JA 2367]

Definition of "Advertising Injury" for 1985-91 CGL Policies:

injury arising out of an offense committed during the policy period occurring in the course of the named insured's advertising activities, if such injury arises out of libel, slander, defamation, violation of right of privacy, piracy, unfair competition, or infringement of copyright, title or slogan. [JA 2367].

Advertising Injury Coverage Under the 1986-89 UEL Policies:

The company will pay . . . all sums . . . which the insured shall become legally obligated to pay . . . as damages . . . because of:
    . . .
    (c) advertising injury or damage

with respect to which this policy applies and caused by an occurrence.

Definition of "Advertising Injury" for the 1986-89 UEL Policies:

personal injury (other than bodily injury) and injury to intangible property sustained by a person . . . arising out of causes of injury first published in connection with the named insured's advertising activities during the policy period as the result of libel, slander, defamation, piracy, infringement of copyrights,

-29-

invasion of the right of privacy or any negligent act, error or omission in the use of advertising or merchandising ideas. [JA 2470].

Personal Injury Coverage Under the 1992-96 CGL Policies:

a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal injury" . . . to which this coverage part applies.  We will have the right and duty to defend any "suit" seeking those damages. . . .
b.  This insurance applies to:
(1) "Personal Injury" caused by an offense arising out of your business, excluding advertising, publishing, broadcasting or telecasting done by you or for you . . . but only if the offense was committed in the "coverage territory" during the policy period.  [JA 2921].

Definition of Personal Injury for the 1992-96 CGL Policies:

Injury to the feelings or reputation of a natural person other than "bodily injury" or "property damage". . . . [JA 2921].

II. Exclusions

Insurance and Related Operations Exclusion in All UEL Policies

and in CGL Policies until April 1988 (IROE):

This policy does not apply to . . . Personal Injury or Advertising Liability:
(a) resulting from or arising out of
(1) any obligation assumed by any Insured under, or
(2) the failure to discharge, or the improper discharge of, any obligation or duty, contractual or otherwise respecting

-30-

any contract or treaty of insurance, reinsurance, suretyship, annuity, endorsement or employee benefit plan.

. . .

(c) arising out of the rendering of or failure to render professional services in
(1) advising, inspecting, reporting or making recommendations in the Insured's capacity as an insurance company, consultant, broker, agent or representative thereof, or
(2) effecting insurance

. . .

(5) the conduct of an investment, loan or operation, or
(6) any capacity as a fiduciary or trustee for mutual funds, pension or welfare funds or other similar activities . . . [JA 2372].